# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| ) | |
| CANADIAN SOLAR INTERNATIONAL LIMITED; ) <br> CANADIAN SOLAR MANUFACTURING ) <br> (THAILAND) CO., LTD.; CANADIAN SOLAR US ) <br> MODULE MANUFACTURING CORPORATION; ) <br> AMERICAN ALLIANCE FOR SOLAR ) <br> MANUFACTURING TRADE COMMITTEE; TRINA ) <br> SOLAR SCIENCE & TECHNOLOGY (THAILAND) ) <br> LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., ) <br> LTD., ) | |
| ) | |
| Plaintiffs and Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | Consol. Ct. No. 25-161 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and, ) | |
| ) | |
| AMERICAN ALLIANCE FOR SOLAR ) <br> MANUFACTURING TRADE COMMITTEE, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

## ORDER

Upon consideration of the motion of Plaintiffs Trina Solar Science & Technology (Thailand) Ltd. and M.L.T. Solar Energy Product Co., Ltd. for judgment on the agency record pursuant to Rule 56.2 of the Rules of this Court, and all other papers and proceedings herein; it is hereby:

**ORDERED** that Plaintiffs' motion is hereby granted; and it is further

**ORDERED** that the final determination with respect to *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative Countervailing*

*Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed.

Reg. 17,380 (Dep't Commerce Apr. 25, 2025), is hereby remanded to the U.S. Department of

Commerce ("Commerce") with instructions to take such further action as required by the Court's

decision in this matter.


By:     _____
        Timothy M. Reif, Judge


Dated: _____
       New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD., | ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs and Consolidated Plaintiffs, | ) ) ) |  |
| v. | ) ) | Consol. Ct. No. 25-161 |
| UNITED STATES, | ) ) | **NON-CONFIDENTIAL VERSION** |
| Defendant, | ) ) |  |
| and, | ) ) ) | Business proprietary information has been redacted on pages 35, 38, 41, and 43. |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) ) ) |  |
| Defendant-Intervenor. | ) ) |  |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE**
**AGENCY RECORD PURSUANT TO RULE 56.2**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Trina Solar Science & Technology (Thailand) Ltd. ("TTL") and M.L.T. Solar Energy Product

Co., Ltd. ("MLT," collectively "Plaintiffs") hereby move for judgment on the agency record with

respect to their complaint challenging the final determination of the countervailing duty

investigation by the U.S. Department of Commerce ("Commerce") in *Crystalline Silicon*

*Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative*

*Countervailing Duty Determination and Final Affirmative Determination of Critical*

*Circumstances*, 90 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2025) ("*Final Determination*")

P.R. 713 and accompanying Issues and Decision Memorandum (Apr. 18, 2025) ("IDM"), P.R.

703; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*

*from Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline*

*Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia,*

*Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders,* 90 Fed. Reg.

26,791 (Dep't Commerce June 24, 2025), P.R. 731.

Plaintiffs respectfully move, pursuant to Rule 56.2, for the reasons explained in the

accompanying Memorandum, for this Court to hold that the contested portions of the *Final*

*Determination* are unsupported by substantial evidence and otherwise not in accordance with

law.  Plaintiffs further move for this Court to remand this matter to Commerce for disposition

consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
MacKensie R. Sugama
Kenneth N. Hammer
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

Dated:  June 10, 2026                    Counsel for Plaintiffs *Trina Solar Science &*
                                         *Technology (Thailand) Ltd. and M.L.T. Solar*
                                         *Energy Product Co., Ltd.*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD., | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs and Consolidated Plaintiffs, | ) ) | |
| v. | ) ) | Consol. Ct. No. 25-161 |
| UNITED STATES, | ) ) | **NON-CONFIDENTIAL VERSION** |
| Defendant, | ) ) | Business proprietary information has been redacted on pages 35, 38, 41, and 43. |
| and, | ) ) | |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) ) ) | |
| Defendant-Intervenor. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD. AND M.L.T. SOLAR ENERGY PRODUCT CO., LTD.**

Jonathan M. Freed
MacKensie R. Sugama
Kenneth N. Hammer
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar Science & Technology (Thailand) Ltd. and M.L.T. Solar Energy Product Co., Ltd.*

Dated: June 10, 2026

NON-CONFIDENTIAL VERSION

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2(C)................................................................. 1

    A.    Administrative Determination Under Review.......................................... 1

    B.    Issues Presented................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

STANDARD OF REVIEW ....................................................................................... 6

ARGUMENT ........................................................................................................... 8

I.    THE STATUTE DOES NOT EMPOWER COMMERCE TO COUNTERVAIL ALLEGED SUBSIDIES PROVIDED BY THE GOVERNMENT OF CHINA IN A COUNTERVAILING DUTY INVESTIGATION AGAINST THAILAND ....................... 8

II.    COMMERCE FAILED TO ESTABLISH SPECIFICITY IN IMPOSING COUNTERVAILING DUTIES UNDER LTAR PROVISIONS FOR SOLAR INPUTS.... 16

III.    COMMERCE'S DETERMINATION THAT TCZ AND TSM(SQ) ARE "AUTHORITIES" IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.................................... 18

    A.    Legal Background .......................................................................... 18

    B.    Factual Background........................................................................ 20

    C.    Commerce's Refusal to Consider Detracting Evidence on the Deputy Role of the NPC was Unsupported by Substantial Evidence .................................... 22

    D.    The Record Shows that Neither the GOC nor the CCP Has Any Controlling Interest in TCZ ........................................................................... 24

    E.    Commerce Unreasonably Concluded that TCZ was Being Used to Carry Out Government Functions ...................................................................... 25

IV.    COMMERCE'S BENCHMARK SELECTION FOR THE CROSS-BORDER PROVISION OF WAFER FOR LTAR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE............. 28

    A.    Factual Background........................................................................ 28

    B.    Legal Background .......................................................................... 30

    C.    Commerce's Determination to Disregard Tier One Benchmark Information is Unsupported by Substantial Evidence ................................................ 31

    D.    Commerce's Tier Two Benchmark Selection for Silicon Wafer is Unsupported by Substantial Evidence .................................................................. 32

V.    COMMERCE'S BENCHMARK SELECTION FOR THE CROSS-BORDER PROVISION OF SOLAR GLASS FOR LTAR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE 37

    A.    Factual Background ............................................................................... 38

    B.    Commerce's Rejection of Non-Distortive Tier One Benchmark Data in Favor of Unrepresentative Tier Two Data is Not Supported by Substantial Evidence ........ 40

    C.    Commerce's Rejection of PV Insights Data as a Tier Two Benchmark Contradicts Record Evidence ................................................................................. 42

VI.    COMMERCE'S REFUSAL TO INVESTIGATE THE CROSS-BORDER PROVISION OF WAFER FOR LTAR IN MALAYSIA WHILE INVESTIGATING THE SAME PROGRAM IN THAILAND WAS AN ABUSE OF DISCRETION .................................. 44

CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

### CASES

*An Giang Fisheries Import and Export Joint Stock Company v. United States*, 179 F.Supp.3d 1256 (Ct. Int'l Trade 2016) ................................................................................. 31

*Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ............ 42

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. U.S.*, 61 F.Supp.3d 1306 (Ct. Int'l Trade 2015) ................................................................................................................ 26, 27

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................ 7

*Canadian Solar Inc. v. United States*, Slip Op. 20-149, 2020 WL 6129754 (Ct. Int'l Trade 2020) ................................................................................................................ 44

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F.Supp.3d 1316 (Ct. Int'l Trade 2018) ................................................................................................................ 36

*Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318 (Fed. Cir. 2020) ............... 16

*Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1295 (Ct. Int'l Trade 2020) ................................................................................................................ 30, 43

*Corley v. United States*, 556 U.S. 303 (2009) ................................................................................ 14

*Dongbu Steel Co. v. United States,* 635 F.3d 1363 (Fed. Cir. 2011) ............................................ 45

*Dubin v. United States,* 599 U.S. 110 (2023) ................................................................................. 17

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ............................................... 31

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Circ. 2002) ............................................ 15

*Fuwei Films (Shandong) Co., Ltd. v. U.S.*, 837 F.Supp.2d 1347 (Ct. Int'l Trade 2012) .............. 37

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ......................... 7

*Groff v. DeJoy*, 600 U.S. 447 (2023) ............................................................................................... 8

*Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 121 F.Supp.3d 1263 (Ct. Int'l Trade 2015) ................................................................................................................ 24

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................................ 8

*Maverick Tube Corp. v U.S.*, 2015 WL 3706539 (Ct. Int'l Trade 2015) ....................................... 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)... 7

*NFIB v. OSHA*, 595 U.S. 109 (2022) ................................................................. 15

*N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) ................................... 7

*NMB Singapore Ltd.* v. *United States*, 557 F.3d 1316 (Fed. Cir. 2009) ............................. 7, 32, 40

*NSK Ltd. v. United States*, 390 F.3d 1352 (Fed. Cir. 2004) .............................................. 45

*Nucor Corporation v. United States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ...................... 7

*Pt. Kenertec Power System v. United States*, 2012 WL 6123546 (Ct. Int'l Trade 2021) ............. 25

*RZBC Group Shareholding Co., Ltd. v. U.S.*, 100 F.Supp.3d 1288 (Ct. Int'l Trade 2015) .......... 36

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ......................................... 7

*Solarworld Americas, Inc. v. United States*, 532 F.Supp.3d 1266 (Ct. Int'l Trade 2012) ...... 27, 42

*Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ..................... 7

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) ........................................... 17

*Tri Union Frozen Products, Inc. v. United States*, 227 F.Supp.3d 1387 (Ct. Int'l Trade 2017) .. 35

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ................................. 7, 23, 37

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................................................. 15

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ............................................... 11

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ...................................................... 8

STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................ 7

19 U.S.C. § 1671 ................................................................................... 8, 14–16

19 U.S.C. § 1671(a) .................................................................................... *passim*

19 U.S.C. § 1671(d) ................................................................................. 10–14

19 U.S.C. § 1671(e) ................................................................................. 12–14

19 U.S.C. § 1677 .......................................................................................... 8

19 U.S.C. § 1677-1 ...................................................................................... 12

19 U.S.C. § 1677(5A)(D) ........................................................................ 2, 16–18

iv

19 U.S.C. § 1677(5)(B)................................................................................*passim*

19 U.S.C. § 1677e(a)................................................................................ 18

19 U.S.C. § 1677f(i)(3)(A) ........................................................................ 7


**REGULATIONS**

19 C.F.R. § 351.311(b) ............................................................................. 45

19 C.F.R. § 351.511(a)(2)................................................................*passim*

19 C.F.R. § 351.527 ................................................................................. 14

**ADMINISTRATIVE MATERIALS**

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug 23, 2023) .............. 44

*Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments*, 54 Fed. Reg. 23,366 (Dep't Commerce May 31, 1989) .................................................. 9

*Countervailing Duties*, 63 Fed. Reg. 65,348, (Nov. 25, 1998)....................................................... 13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) ............................................................................ 34

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 7,531 (Feb 10, 2020) ............................................................................ 34

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 79,163 (Dec. 9, 2020) ............................................................. 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2018*, 86 Fed. Reg. 21,691 (Apr. 23, 2021)........................... 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 40,491 (Jul. 7, 2022) .................................... 41, 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021*, 88 Fed. Reg. 88,575 (Dec. 22, 2023) .................... 36, 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2020*, 88 Fed. Reg. 1,355 (Jan. 10, 2023)......................... 36, 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation and Preliminary Results of Changed Circumstances Review*, 89 Fed. Reg. 53,388 (Jun. 26, 2024). .......................................................... 44

*C Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, Form Thailand:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Duty Determination*, 89 Fed. Reg. 80,874 (Oct. 4, 2024) .................................................................................................................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2025) ...................... 1

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders,* 90 Fed. Reg. 26,791 (Dep't Commerce June 24, 2025) ................................................................ 1

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,831 (Mar. 25, 2024) ............................................................................................................. 14

*Utility Scale Wind Towers from Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) ............................................... 9

NON-CONFIDENTIAL VERSION

## MEMORANDUM IN SUPPORT OF MOTION FOR
## JUDGMENT UPON THE AGENCY RECORD

Plaintiffs, Trina Solar Science & Technology (Thailand) Ltd. ("TTL"), and M.L.T. Solar Energy Product Co., Ltd. ("MLT," collectively, "Plaintiffs") hereby submit this Memorandum of Points and Authorities in Support of their Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of this Court. Plaintiffs respectfully request that the Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce"), and remand with instructions consistent with this Memorandum.

### STATEMENT PURSUANT TO RULE 56.2(C)

#### A.      Administrative Determination Under Review

This action is an appeal from Commerce's determination in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2025) ("*Final Determination*") P.R. 713, and accompanying Issues and Decision Memorandum (Apr. 18, 2025) ("IDM"), P.R. 703; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders,* 90 Fed. Reg. 26,791 (Dep't Commerce June 24, 2025), P.R. 731.

#### B.      Issues Presented

1.      **Whether Commerce's determination to countervail transnational subsidy programs was supported by substantial evidence and was otherwise in accordance with law?**

No. Commerce's determination to countervail the alleged transnational subsidy programs of the provision of silicon wafers, silver paste and solar glass from China for LTAR

NON-CONFIDENTIAL VERSION

was unsupported by substantial evidence and otherwise not in accordance with law because the

plain language of the statue limits CVD investigations to subsidies bestowed by a single country.

**2.      Whether Commerce's specificity finding for the transnational subsidy of the cross-border provision of solar inputs for less-than-adequate-remuneration ("LTAR") was supported by substantial evidence and was otherwise in accordance with law?**

No. Commerce's specificity finding was unsupported by substantial evidence where it

relied on nullified authority to place TTL "within the jurisdiction" of the GOC.  Further,

Commerce's finding contradicts the plain language of 19 U.S.C. § 1677(5A)(D) and is otherwise

not in accordance with law.

**3.      Whether Commerce's determination that TTL's affiliated suppliers constituted "authorities" under 19 U.S.C. § 1677(5)(B) was supported by substantial evidence and was otherwise in accordance with law?**

No.  Commerce's determination to treat TTL's affiliated suppliers as "authorities" under

the statute failed to consider substantial detracting evidence, nor did Commerce incorporate its

own analytical framework pursuant to its *Public Bodies Memo*.

**4.      Whether Commerce's benchmark selection for its benefit calculation to value silicon wafers for LTAR was supported by substantial evidence and was otherwise in accordance with law?**

No.  Commerce's benchmark selection of unrepresentative world export data under HTS

3818.00 was unsupported by substantial evidence when preferrable tier one benchmarks were

available on the record.  Finally, Commerce failed to provide sufficient reasoning for departing

from its past practice to rely on Bloomberg data as a tier two benchmark.

**5.      Weather Commerce's benchmark selection for its benefit calculation to value solar glass for LTAR was supported by substantial evidence and was otherwise in accordance with law?**

No.  Commerce's benchmark selection of unrepresentative world export data under HTS

7007.19 was unsupported by substantial evidence when preferrable tier one benchmarks were

2

available on the record.  Finally, Commerce failed to provide sufficient reasoning for departing from its past practice to rely on PV Insights as a tier two benchmark.

6.     **Whether Commerce's imposition of countervailing duties for the transnational provision of wafers for LTAR was arbitrary and an abuse of discretion when equivalent facts existed for Malaysian producers and Commerce declined investigate Malaysian cell and module producers?**

No.  Commerce applied disparate treatment to producers under investigation in Thailand by not initiating an investigation into the cross-border provision of wafer for LTAR, contrary to the mandate in its regulations.

7.     **Whether Commerce's affirmative determination of critical circumstances as to all exporters and producers from Thailand is supported by substantial evidence and otherwise lawful.**

Plaintiffs understand that this issue currently is not ripe for review because the International Trade Commission's ("ITC's") threat finding in its companion investigation—which is currently subject to challenge before this Court—means that Commerce has not effectuated its critical circumstances finding.  Nonetheless, Plaintiffs seek to preserve its right to pursue this issue in the event it becomes ripe at a later point in the litigation.

## STATEMENT OF FACTS

On April 24, 2024, the American Alliance for Solar Manufacturing Trade Committee ("Petitioner") filed a petition seeking countervailing duties on imports of crystalline silicon photovoltaic ("CSPV") cells from Cambodia, Malaysia, Thailand, and Vietnam.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 43,816 (May 20, 2024), P.R. 103.  On May 15, 2024, Commerce initiated a countervailing duty investigation against CSPV cells from Thailand, with the period of investigation ("POI") covering calendar year 2023.  *Id.*  On June 20, 2024, Commerce released

3

its respondent selection memorandum stating that it had selected TTL as the sole mandatory respondent for Thailand.  *See* "Respondent Selection Memo," (June 21, 2024) ("Respondent Selection Memo"), P.R. 164, C.R. 47.  While not selected as a mandatory respondent, MLT received the "all others" rate for non-examined exporters.

On August 12, 2024, the Petitioner filed a new subsidy allegation ("NSA") against the cross-border provision of silicon wafers at less-than-adequate renumeration ("LTAR"), asserting that the Government of China ("GOC"), through TTL's affiliates, provided countervailable subsidies of solar wafers for LTAR.  *See* Letter from Wiley Rein, "New Subsidy Allegations," at 1–28 (Aug. 12, 2024) ("Pet. NSA"), P.R. 198.  A few weeks later, on August 26, 2024, the Petitioner filed additional NSAs against the cross-border provision of Chinese silver paste and solar glass for LTAR.  *See* Letter from Wiley Rein, "New Subsidy Allegations," at 1–21 (Aug. 26, 2024) ("Pet. Glass/Paste NSA"), P.R. 373.  Commerce subsequently initiated an investigation into Petitioner's NSAs covering the cross-border provisions of silicon wafer, solar glass, and silver paste for LTAR on September 20, 2024, and October 28, 2024, respectively.  *See* Commerce Memorandum, "Decision Memorandum on New Subsidy Allegation," (Sept. 20, 2024), P.R. 481; Commerce Memorandum, "Decision Memorandum on New Subsidy Allegations Regarding the Provision of Solar Glass and Silver Paste for Less Than Adequate Remuneration," (Oct. 28, 2024), P.R. 569.

On October 4, 2024, Commerce published its Preliminary Determination in the Federal Register.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, Form Thailand:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Duty Determination*, 89 Fed. Reg. 80,874 (Oct. 4, 2024)

4

**NON-CONFIDENTIAL VERSION**

("*Preliminary Determination*"), P.R. 523; *see also* accompanying Preliminary Decision Memorandum (Sept. 30, 2024) ("PDM"), P.R. 509.  Commerce calculated a preliminary weighted-average dumping margin of 0.14 percent for TTL.  In its *Preliminary Determination*, Commerce stated that it would address the Petitioner's NSAs in a post-preliminary memorandum.  PDM, at 4.

On January 7, 2025, Commerce released its post-preliminary analysis memorandum addressing the Petitioner's NSAs on the cross-border provisions of Chinese silicon wafers, silver paste, and solar glass for LTAR.  *See* Commerce Memorandum, "Decision Memorandum for the Post-Preliminary Analysis in the Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand," (Jan. 7, 2025) ("Post-Prelim LTAR Memo"), P.R. 634.  Commerce determined that each alleged LTAR program was countervailable, and that TTL benefited from such programs.  In doing so, Commerce determined that Trina Solar Co., Ltd. ("TCZ") and Trina Solar (Suqian) Silicon Materials Co., Ltd. ("TSM(SQ)"), affiliated suppliers to TTL, were "authorities," as defined by 19 U.S.C. § 1677(5)(B), that provided a financial contribution to TTL in the form of solar inputs for LTAR.  *Id*., at 7.  Commerce further made a specificity finding as to each program based on Petitioner's NSA submissions.  *Id*., at 9.  In selecting a benchmark to value silicon wafers for LTAR, Commerce selected a tier one benchmark using Thai import statistics submitted by the Royal Thai Government ("RTG") under HTS code 3818.00, exclusive of Chinese data.  *Id*., at 12.  In selecting a benchmark for solar glass, Commerce selected a tier one benchmark using TTL's actual glass purchases.  *Id*., at 17–18.  As a result of Commerce's LTAR findings, TTL's post-preliminary subsidy rate was 13.59 percent.  *See* Commerce Memorandum, "Post-Preliminary Analysis Calculations for Trina Solar Science & Technology (Thailand) Ltd.," at

Attach. 1 (Jan. 7, 2025) ("Post-Prelim Calc Memo"), P.R. 637, C.R. 288.

On April 25, 2025, Commerce published its *Final Determination* in the Federal Register. 90 Fed. Reg. 17,380. Based on Commerce's finding that the GOC provided countervailable subsidies through the cross-border provision of silicon wafer, solar glass, and silver paste for LTAR, TTL received a final subsidy rate of 263.74 percent, a nearly 2,000 percent increase from its post-preliminary analysis rate of 13.59 percent. This rate also served as the "All Others" rate applicable to MLT. In the final determination, Commerce continued to find that TTL benefited from the cross-border provision of Chinese silicon wafer, silver paste, and solar glass for LTAR, and that TTL's input suppliers, TCZ and TSM(SQ) constituted GOC "authorities" under 19 U.S.C. § 1677(5)(B). *See* IDM, at 7. Commerce found each program to be specific as a domestic subsidy pursuant to 19 U.S.C. § 1677(5A)(D). *Id.* In the *Final Determination*, Commerce made changes to its selection of benchmarks for valuing silicon wafer and solar glass for LTAR. For silicon wafer, it selected a tier two benchmark of U.N. Comtrade ("Comtrade") world export data under HTS code 3818.00. *Id.*, at 51. For solar glass, Commerce similarly disregarded tier one information on the record in favor of a tier two benchmark by using Comtrade world export data under HTS code 7007.19. *Id.*, at 58.

Finally, in response to parties' arguments that Commerce afforded disparate treatment to countries under investigation by declining to investigate the cross-border provision of wafer for LTAR in Malaysia,—but doing so for Vietnam, Thailand, and Cambodia—Commerce declined to initiate such investigation. *Id.*, at 87.

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination, the Court "shall hold unlawful any determination, finding, or conclusion found. . . to be unsupported by substantial evidence on

the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951).  It must

be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to

be established."  *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

The Court "looks to the record as a whole, including any evidence that fairly detracts from the

substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319,

1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted).  Commerce must provide a

"rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc.

v. United States*, 371 U.S. 156, 168 (1962) and "examine the relevant data and articulate a

satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

Commerce is also required to include in its final determination "an explanation of the

basis for its determination that addresses relevant arguments{ } made by interested parties who

are parties to the investigation or review."  19 U.S.C. § 1677f(i)(3)(A).  *See also NMB

Singapore. Ltd.* v. *United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Further, the Court will

not sustain Commerce's determination when Commerce failed to address a party's relevant

argument.  *See Nucor Corporation v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade

2020) (*citing Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade

2019).

A determination, finding, or conclusion is not in accordance with law if it is arbitrary.

*See SKF USA Inc. v. United States*, 263 F.3d 1369, 1378, 1382 (Fed.Cir.2001) ("it is well-

NON-CONFIDENTIAL VERSION

established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently") (internal quotations omitted).

## ARGUMENT

**I.    THE STATUTE DOES NOT EMPOWER COMMERCE TO COUNTERVAIL ALLEGED SUBSIDIES PROVIDED BY THE GOVERNMENT OF CHINA IN A COUNTERVAILING DUTY INVESTIGATION AGAINST THAILAND**

Commerce lacks statutory authority to countervail "transnational subsidies." The text and structure of 19 U.S.C. §§ 1671 and 1677 require that the subsidizing "authority" is the government of the same country that is under investigation, not the government of a third country. Commerce's determination to countervail the alleged cross-border provision of Chinese silicon wafers, silver paste, and solar glass for LTAR exceeds its statutory authority.

Questions of statutory interpretation must "begin with, and ultimately heed what the statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (internal quotations omitted). The Administrative Procedures Act ("APA") requires that courts, not administrative agencies, decide questions of law arising from agency action—even those involving ambiguous laws—and set aside any action that is inconsistent with the law as courts interpret it. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024). Section 706 of the APA "makes clear that agency interpretations of statutes—like agency interpretations of the constitution—are not entitled to deference." Moreover, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014).

Both the text and the context of 19 U.S.C. § 1671 demonstrate that the statute does not grant Commerce authority to impose countervailing duties for countervailable subsidies provided by a government or public entity other than the government of the country that is the subject of

NON-CONFIDENTIAL VERSION

the CVD investigation.  § 1671(a) provides that Commerce shall generally impose a countervailing duty only if it:

> determines that *the* government of *a country* or any public entity within the territory of *a country* is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States.

*Id*. (emphasis added).  The statute's use of singular language therefore emphasizes that Commerce is to focus on the provision of countervailable subsidy with respect to a particular government of one country.

Commerce does not claim that the statute contains an explicit grant of authority to countervail transnational subsidies.  Rather, Commerce grounds its position that it has statutory authority to countervail transnational subsidies in what it characterizes as ambiguities in the statute and what it argues is the absence of a prohibition.  *See* IDM, at 26 (arguing that Section 1671(a) "does not specify that the 'government of a country of any public entity within the territory of a country' providing the countervailable subsidy must be the same government or public entity as the government of the country within which that subsidy is received").

Commerce's position contradicts its own prior, reasonable interpretation of the statutory text.  In initially promulgating its regulation prohibiting transnational subsidies, Commerce found that transnational subsidies are not countervailable "to the extent that funds for the program are not provided by the *government of the country in question*."  *Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments*, 54 Fed. Reg. 23,366, 23,374 (Dep't Commerce May 31, 1989) (emphasis added).  In the past, Commerce even recognized that the singular language demonstrates "that the general rule is that Commerce's CVD analysis is focused on a particular (*i.e.*, 'the') government of a country."  *Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) (final affirmative countervailing

9

duty determination), and accompanying Issues and Decision Memorandum, at 58 ("Malaysia Wind Towers IDM").  Yet, Commerce contradicted its prior logic and instead focused on "{t}he use of the indefinite article '*a* country,'" which it argues shows "that the country of the authority providing a countervailable subsidy may be distinct and separate from the country where the countervailable subsidy is received."  IDM, at 26 (emphasis in original).  Commerce also grounds its changed interpretation in its claim that 19 U.S.C. § 1677(5)(B) contains similar language, which defines "a subsidy as a case in which '*an* authority provides a financial contribution' and defining 'authority' as '*a* government of *a* country."  *Id*.  (emphasis in original).

The context of the statutory language cited by Commerce seriously undermines the notion that the statute grants Commerce the authority to expand CVD investigations beyond the country in which the country in which the merchandise under investigation is produced, manufactured, or from which it is exported.  Specifically, the latter portion of Section 701(a) quoted above shows that the statute authorizes Commerce to impose a countervailing duty only upon a single country from which subject merchandise is imported rather than any country that may provide a subsidy.  Commerce's interpretation that the statute empowers it to investigate and countervail transnational subsidies in addition to subsidies provided by the government under investigation clearly does not give effect to the statute's reference to a single country or public entity within the territory of a single country.  It also violates the statutory construction canon of *expressio unius est exclusion alterius (i.e.,* "the expression of one thing is the exclusion of the other").  As discussed in greater detail below, the fact that the statute allows for the imposition of countervailing duties on benefits provided by the government of a single "*country*," except as permitted by 19 U.S.C. § 1671(d), explicitly excludes the possibility that

10

NON-CONFIDENTIAL VERSION

Commerce may impose countervailing duties on benefits provided by a second country.  19 U.S.C. § 1671(a).

Moreover, the first portion of Section 701(a) uses the definite article "the" and the singular noun "country" to refer to "*the* government of *a* country or any public entity within the territory of *a country*," not "the *governments of countries* or any public entity within the territory of *countries*."  19 U.S.C. § 1671(a) (emphasis added).  Congress could not have intended to expand CVD investigations to include third countries merely because it chose an indefinite article.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

Second, Commerce's interpretation fails to give meaning to the phrase "any public entity *within the territory of a country*" because it allows Commerce to impose countervailing duties on countervailable subsidies bestowed by a public entity in China *outside* the territory of a country and bestowed by a public entity in Thailand.  No language of § 1671(a) expands the scope of countervailable subsidies beyond the territory of a country in which merchandise is manufactured, produced, or exported except in the limited circumstances provided for elsewhere in § 1671.

The statute creates two narrow exceptions to the general rule that Commerce is to investigate and remedy subsidies bestowed by the government of a single country from which the merchandise is produced or exported.  First, 19 U.S.C. § 1671(d) allows Commerce to cumulate countervailable subsidies received by individual "members (or other participating entities) of an international consortium *engaged in the production of subject merchandise*" by each country in which manufacture, production and/or export occurs with countervailable subsidies provided directly to the international consortium.  19 U.S.C. § 1671(d) (emphasis

11

added). The fact that the statute allows for the imposition of countervailing duties on benefits provided by the government of a single "*country*," except as permitted by § 1671(d), explicitly excludes the possibility that Commerce may impose countervailing duties on benefits provided by a second country. 19 U.S.C. § 1671(a).

Second, § 1671(e) allows Commerce to investigate whether an upstream subsidy, as defined in 19 U.S.C. § 1677-1, is being paid and bestowed, and, if so, to include the amount of upstream subsidy, in the countervailable subsidy rate. *Id*. at § 1671(e). However, 19 U.S.C. § 1677-1(a)(1) generally limits an "upstream subsidy" to a countervailable subsidy, other than an export subsidy, that, among other requirements, is bestowed by an authority with respect to an input product that is used in the *same* country that is the subject of the countervailing duty proceeding. *Id*. at § 1677-1(a). The only circumstance where the statute permits Commerce to impose countervailing duties on an "upstream subsidy" conveyed by a country other than the country in which manufacture or production of the subject merchandise is where the countervailable subsidy is provided by a customs union. *Id*. If the subsidy is provided by a customs union, then Commerce is permitted to treat two or more foreign countries organized into a customs union as one country. *Id*. If Congress had intended to generally grant Commerce authority to impose countervailable on both domestic subsidies and cross-border subsidies provided by multiple countries in a single investigation, there would be no reason to treat two or more foreign countries organized into a customs union as a single country. A contrary construction of § 1671(a) would violate the statutory canon against surplusage.

Commerce's interpretation of §1671(a) also violates the statutory construction canon of *expressio unius est exclusion alterius* (i.e.*,* "the expression of one thing is the exclusion of the other"). The fact that the statute allows for the imposition of countervailing duties on benefits

provided by the government of a single "*country*," except as permitted by 19 U.S.C. § 1671(d), explicitly excludes the possibility that Commerce may impose countervailing duties on benefits provided by a second country.  *See* § 1671(a).

Commerce's interpretation of § 1671(a) as permitting it to countervail subsidies bestowed by a third country fails to give meaning to the phrase "any public entity *within the territory of a country*" because it allows Commerce to impose duties on countervailable subsidies bestowed by a public entity in China *outside* the territory of a country and bestowed by a public entity in Thailand in a single investigation outside of the context of §§ 1671(d) and (e).  No language of § 1671(a) expands the scope of countervailable subsidies beyond the territory of a country in which merchandise is manufactured, produced, or exported except in the limited circumstances provided for elsewhere in 19 U.S.C. § 1671.  On the contrary, the terms "government of *a country*" or "any public entity *within the territory of a country*" plainly limit Commerce to investigating subsidies granted by the government of a country in which the merchandise is manufactured, produced, or exported or by a public entity <u>*within*</u> the territory of the same country.

Even if Commerce's observation that § 1671(a) does not include geographic limitations on countervailing subsidies were correct, *see* IDM, at 27, the statute does impose geographic limitations by limiting the number of countries whose subsidies can be countervailed in a single proceeding outside of the context of §§ 1671(d) and 1671(e).  Commerce's interpretation would render 19 U.S.C. § 1671(d) superfluous.  If Commerce could simply characterize subsidies as "transnational" as opposed to "international consortium" or "upstream" subsidies, then there would be no reason for Congress to have enacted §§ 1671(d) and (e).  This would violate the interpretive canon that "a statute should be construed so that effect is given to all of its

provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal marks and quotation marks omitted).

In promulgating its former regulation 19 C.F.R. § 351.527, Commerce stated that "neither the successorship of 19 U.S.C. § 1671 for Subsidies Code members nor the repeal of section 303 by the URAA eliminated" the rule barring it from countervailing transnational subsidies in most contexts. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,404–05 (Nov. 25, 1998) (final rule). Indeed, Commerce continuously recognized that its current interpretation would create a surplusage in the statute as to both §§ 1671(d) and (e). *See* Malaysia Wind Towers INV IDM at 58 (stating that the same language of § 1671(a) "indicates the general rule that {its} CVD analysis is focused on a particular (*i.e.*, "the") country.

Yet, in repealing the same regulation, Commerce justified a complete about face in its statutory interpretation based on a change in administrative experience. *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,826 (Dep't Commerce Mar. 25, 2024). There, as in the *Final Determination,* Commerce claims that it believes its past regulatory interpretation of 19 U.S.C. § 1671 was overly restrictive because it has observed increased instances in which a government subsidizes foreign production. *Id*.; *see also* IDM, at 27. A change in observed behavior of foreign governments cannot support a change in interpretation of statutory language, particularly where that changed interpretation fails to give effect to all statutory language, as discussed above.

Commerce illogically found that the same language it had previously concluded limited its authority to countervail transnational subsidies (*i.e.*, §§ 1671(d) and (e)) now support a *general* authority to countervail transnational subsidies whenever it sees fit. IDM, at 30

14

(concluding that §§ 1671(d) and (e) provide frameworks for the investigation of certain subsidies but do not "restrict the framework by which to examine transnational subsidies such as those at issue here"). The Courts have already pushed back on similar spurious logic that unlawfully expands Commerce's authority. *See FAG Italia S.p.A. v. United States*, 291 F.3d 806, 817 (Fed. Cir. 2002) ("The fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances."). Since the statute limits Commerce's authority to countervail third-country subsidies to the narrow circumstances envisioned under the international consortium and upstream subsidies provisions, Commerce's conclusion that it has the same authority in *all* circumstances unlawfully expands Congress's grant of such authority beyond the terms stated in the statute.

Finally, the major questions doctrine further underscores that Congress did not grant Commerce the power to countervail these alleged transnational subsidies. When an agency "claim{s} to discover in a long-extant statute an unheralded power" that would result in a "transformative expansion in {its} regulatory authority," the major questions doctrine requires the agency to identify "clear congressional authorization" of that authority, rather than "a merely plausible textual basis." *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022). Moreover, the doctrine is especially apt when (as in this case) the longstanding interpretation of the statute was that it did not entail such a power.

As discussed above, Commerce's determination contradicts its long-held position that the statute does not allow it to countervail cross-border subsidies. That reason alone should prevent the Court from agreeing that the statute conveys some unstated authority to countervail transnational subsidies. *See NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (stating that a "lack of historical precedent" should indicate that a broad authority claimed by an agency is "beyond the

15

agency's legitimate reach.")  Applying the doctrine here, Commerce's about-face, which greatly expands its authority to countervail transnational subsidies in a manner it long found was beyond its powers, implicates a major question.  For the reasons discussed above, the Court should conclude that Congress conveyed no authorization to support countervailing transnational subsidies beyond the narrow contexts in which it explicitly conveyed such authority.  Therefore, Commerce's contrary interpretation is not a permissible reading of the statute and must be set aside as inconsistent with 19 U.S.C. § 1671.

## II. COMMERCE FAILED TO ESTABLISH SPECIFICITY IN IMPOSING COUNTERVAILING DUTIES UNDER LTAR PROVISIONS FOR SOLAR INPUTS

In order to be countervailable, a subsidy must be "specific" as defined under 19 U.S.C. § 1677(5A).  *See Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1329 (Fed. Cir. 2020).  "To be 'specific,' a subsidy must be 'an export subsidy,' 'an import substitution subsidy,' or one of certain "domestic subsid{ies}." *Id*. (*quoting* 19 U.S.C. § 1677(5A)).  For each of the transnational LTAR programs countervailed, Commerce determined that each were specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(I), the subsection for "domestic subsidy." *See* IDM, at 42.  Specifically, the statute provides:

> In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, *to an enterprise or industry within the jurisdiction of the authority providing the subsidy*, the following guidelines shall apply….In evaluating the factors set forth …, the administering authority *shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy*, and the length of time during which the subsidy program has been in operation.

19 U.S.C. § 1677(5A)(D) (emphasis added).

Thus, a domestic subsidy is "specific" only if granted to an enterprise *within the jurisdiction of the authority providing the subsidy.*  TTL is located within the jurisdiction of Thailand.  To overcome this, Commerce determined that TTL was "within the jurisdiction of the

16

{GOC} for the purposes of our specificity analysis in this investigation." *See* IDM, at 42, *citing* GOC Transnational Subsidies Response, Exhibit II.A.2 (Provisional Measures for Supervision and Administration of Outbound Investment by Centrally Administered Enterprises – Order No. 28 (2012) ("SASAS Decree 28"), at Article 2 (Aug.16, 2024). P.R. 215–219.

Commerce's rationale for finding TTL *within the jurisdiction of the authority providing the subsidy* is not supported by the record and still does not overcome the statutory perquisite for specificity that the enterprise is "within" the jurisdiction of the GOC.  First, the measure or order that Commerce relied on was nullified or repealed as indicated in Exhibit II.A.2 itself and in the GOC's response.  *Id.*, at page 15 and Exhibit II.A.2, page 1.  Commerce's assertion that TTL is subject to the SASAC Decree 28 was already tenuous, but that the decree was already nullified removes any factual basis for Commerce to find that TTL was subject to Chinese jurisdiction.

But even if the decree remained valid, its existence would not satisfy the statutory requirement in §1677(5A)(D) because the word "jurisdiction" can only be taken in a geographic sense.  First, the title of subsection (D) is "Domestic subsidy," which denotes a distinction between domestic and foreign territory.  *See Dubin v. United States,* 599 U.S. 110, 120–21 (2023) ("This Court has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.").  Second, subparagraph (iv) states: "{w}here a subsidy is limited to an enterprise or industry l*ocated within a designated geographical region within the jurisdiction of the authority providing the subsidy*, the subsidy is specific."  19 U.S.C. § 1677(5A)(D)(iv) (emphasis added). In this context, "jurisdiction" must carry a geographic meaning as this is the natural presumption that identical words used in different parts of the same act are intended to have the same meaning.  *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012) ("{I}t is a normal rule of

17

statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (citation modified)).

Commerce's determination that TTL was "within the jurisdiction" of the GOC is both contrary to law and unsupported. A subsidy is specific within the meaning of Section 1677(5A)(D) only if the recipient is territorially "within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D). Thus, Commerce's application of countervailing duties for transnational LTAR programs lack specificity and must be found contrary to law.

## III. COMMERCE'S DETERMINATION THAT TCZ AND TSM(SQ) ARE "AUTHORITIES" IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In its final determination, Commerce erroneously determined based on facts otherwise available pursuant to 19 U.S.C. § 1677e(a), that TCZ and TSM(SQ) are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B). IDM, at 76. Specifically, based on TCZ's public statements that it is "actively implementing" certain GOC initiatives, Commerce determined that the GOC controls TCZ, and by extension its affiliate TSM(SQ). *Id.*, at 73. For the reasons below, Commerce's determination that TCZ and TSM(SQ) are controlled by the GOC and the Chinese Communist Party ("CCP") is not supported by the record. Commerce ignored detracting evidence and failed to analyze additional indicia showing the absence of government control. Because nothing in the record supports a finding that TCZ or TSM(SQ) is controlled by the CCP or GOC, Commerce's determination is unsupported by substantial evidence.

### A. Legal Background

19 U.S.C. § 1677(5)(B) defines a "countervailable subsidy" as a subsidy in which "an authority" provides a "financial contribution" to a person and "a benefit is thereby conferred." This provision further defines "authority" as "a government of a country or any public entity

18

within the territory of the country." 19 U.S.C. § 1677(5)(B). Commerce has defined the term

"public entity within the territory of a country" by analyzing what "functions or conduct are of a

kind that are ordinarily classified as governmental in the legal order of the relevant {country}."

*See* Letter from Petitioner, "Petitioner's Benchmark Submission Part 1 – Information Related to

Transnational Policy Lending," at Ex. 2 (including Commerce's May 18, 2012 Public Bodies

Analysis, at pp 2 ("*2012 Public Bodies Memo*")) (Sept. 6, 2024), P.R. 419. The criteria

Commerce assesses to determine whether the GOC is exercising meaningful control over an

enterprise depends on the level of ownership interest maintained by the GOC in the enterprise in

question. *Id.*, at 2012 Public Bodies Memo (pp. 5).

Where a government has maintained full or controlling ownership interest, Commerce

has found that the enterprise in which the GOC has a full or controlling interest is a "public

body," and, therefore, a "public entity" that is an authority under 19 U.S.C. § 1677(5)(B). *Id.*, at

pp. 37. However, where the government only has a significant ownership interest—a threshold

that Commerce does not define—and those enterprises are subject to certain government

industrial plans, Commerce undertakes a case-by-case analysis to determine whether *additional*

factors, *i.e.*, other than the fact that those enterprises are subject to GOC industrial plans, show

that such enterprises are "used as instruments by the government to uphold the socialist market

economy." *Id.*, at pp. 38. Commerce will not conclude that an enterprise in which the GOC has

even "a significant ownership interest" is a public entity unless the facts surrounding the

individual case also show "additional indicia" that an enterprise is "being used to carry out

government functions." *Id.*, at pp. 5. Those factors include: (1) the presence of government

appointed company officials; (2) the presence of government or CCP officials on the board or in

management; and (3) the existence and role of a CCP committee. *Id.*, at pp. 38.

## B. Factual Background

In response to Commerce's questionnaire, the GOC confirmed that no government-owned entities supplied any wafers, solar glass, or silver paste to TTL. Post-Prelim LTAR Memo, at 3. Nonetheless, Commerce found that the GOC failed to provide other requested information for private, individually owned companies and relied on "facts otherwise available" pursuant to 19 U.S.C. §.1677e(a), drawing instead on the Petitioner's allegations, to determine that TTL's suppliers, TCZ and TSM(SQ), were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B). *Id.*, at 7. In doing so, Commerce listed the following findings to support its determination that TTL's suppliers were "authorities" controlled by the GOC:

- TCZ's largest shareholder and chief executive officer (CEO), Mr. Gao Jifan, serves as a Deputy in the National People's Congress ("NPC") (citing the Petitioner's Letter, "Petitioner's Comments on TTL's Affiliation Questionnaire Response," at 8–9 (Oct. 7, 2024) ("Pet. Affiliation Comments"), P.R. 536–542, C.R. 239–245;

- Mr. Gao also served as first chairman of the China Photovoltaic Industry Association (CPIA), and he continues to serve as honorary chairman of the CPIA. The CPIA is a national association approved by the Ministry of Civil Affairs of China, which is under the control of the GOC and CCP. The CPIA coordinates with the CCP and GOC "to guarantee alignment with the official vision for industrial policy and {} the role of industry associations in promulgating guidance to firms." (citing *id.*, at 9–10);

- TCZ stated publicly that it "is deeply studying the spirit of the Third Plenary Session of the 20th {CCP} Central Committee, actively implementing the important instructions of General Secretary Xi Jinping on the construction of Trina Solar's National Key Laboratory of Photovoltaic Science and Technology and industrial layout during this year's National Two Sessions." (citing *id.*, at 10–11, Ex. 20);

- Although TCZ is nominally a publicly traded company, Mr. Gao (i.e., a Deputy to the NPC and CPIA Chair) and his wife control nearly 44 percent of TCZ's equity. (citing *id.*, at 11, Ex. 21);

- State-backed and state-owned entities have invested in TCZ, including Dangtu Reliance Emerging Industry Fund and Shanghai Xingjing Investment Management Co., Ltd. (citing *id.*, at 11, Ex. 13);

20

- Record evidence shows that TCZ actively promotes the GOC's Belt and Road Initiative (BRI) policies. For example, at the time TCZ established TTL, Mr. Gao commented that "{TCZ's} Thailand factory and other projects in Asia-Pacific are in line with the 'Belt and Road' policy advocated by the Chinese government, connecting the Asian economy and achieving mutual benefit." (citing *id*., at 12, Ex. 30);

- TCZ works with Chinese state-owned enterprises, such as the State Grid Corporation of China, in constructing its manufacturing facilities in BRI countries. (citing *id*., at 12, Ex. 27).

Post-Prelim LTAR Memo, at 6–7.  Notably, despite briefing from interested parties raising significant detracting evidence, Commerce's final determination recited the identical list of findings without modification or supplement.  *See* IDM, at 73, compared to Post-Prelim LTAR Memo, at 6–7.  Commerce's failure to engage with the detracting evidence, discussed below, renders its determination unsupported by substantial evidence.

The record further established that Mr. Gao's NPC deputy position is purely ceremonial and does not confer any legislative authority.  *See* Letter from TTL, "Rebuttal Comments on Petitioner's Comments on TTL's Supplemental Affiliation Questionnaire Response," Ex. R1 (pp. 2) (Oct. 24, 2024) ("TTL Aff. Comments"), P.R. 554–562, C.R. 250–258.  A report from the Harvard Kennedy School explained that the NPC comprises nearly 3,000 members drawn from business, academia, arts, and sports, and convenes only once a year for ten days.  *Id*., at Ex. R1 (pp. 1, pp. 9).  The report drew a critical distinction between the NPC's two components: (1) the Standing Committee, comprising roughly 150 members who hold exclusive authority over legislative matters, and (2) all remaining NPC members, whose appointments are "ceremonial or a reward for service in a variety of sectors" and who have no legislative authority.  *Id*. at Ex. R1, pp. 2.  Mr. Gao falls into this second category—he is not a member of the Standing Committee and holds only a ceremonial deputy position requiring a ten-day annual commitment.  *Id*., at 7–8.

**NON-CONFIDENTIAL VERSION**

In response to this evidence, Commerce unlawfully disregarded it, asserting that "because of the GOC's refusal to respond to Commerce's requests for information, we are unable to examine and verify any such claims regarding the absence of GOC/ CCP control of the input producers in question." IDM, at 74. Instead, Commerce cited provisions of China's constitution applicable to the NPC as a whole—not to non-Standing-Committee deputies like Mr. Gao:

> Article 57 of the Constitution of the People's Republic of China (as amended, 2004) states that the National People's Congresses is the "highest organ of state power" and Article 62 lays out its responsibilities, which include approving the national economic plan, the state budget, deciding on matters of "war and peace," and exercising "such other functions and powers as the highest organ of state power should exercise.

*Id*. Commerce then asserted that these provisions contradicted TTL's "ceremonial" characterization, and on that basis concluded that the GOC exercises meaningful control over TCZ and TSM(SQ), rendering them "authorities" under 19 U.S.C. § 1677(5)(B).

### C. Commerce's Refusal to Consider Detracting Evidence on the Deputy Role of the NPC Was Unsupported by Substantial Evidence

Commerce's determination that TCZ and TSM(SQ) are "authorities" rests on an unsupported inference that holding a ceremonial, ten-day-per-year NPC general deputy position means that an independent, publicly traded company is under the control of the Chinese government. As a threshold matter, Mr. Gao is not a member of the CCP, and the NPC is not equivalent to the CCP. Commerce's conflation of these distinct roles reflects a fundamental misunderstanding of the record.

Even when relying on facts otherwise available, Commerce cannot ignore detracting evidence from the record that unequivocally demonstrates the ceremonial, non-legislative nature of a non-Standing Committee deputy role. The record contained substantial information, disregarded by Commerce, establishing the non-authoritative and honorary role of NPC deputy members:

- "From the beginning of its existence, the NPC has lacked the organizational muscle to tell the State Council, ministries or courts what to do. Further, the NPC has too many delegates (2,987 at the 2013 Twelfth Congress) and meets too infrequently to really exercise its powers. Thus, the NPS elects a Standing Committee to act on its behalf." TTL Aff. Comments, at Ex. R1, pp.4.

- "It is these members of the Standing Committee who wield that power and are therefore in any meaningful sense government officials." *Id.*, at Ex. R1, pp. 8.

- "NPC members in this second category of delegates only attend the once a year 10-day meeting, or perhaps a special meeting if convened. This makes them quite distinct from members of the House of Representatives or Congress in the USA or the Houses of Parliament in the United Kingdom. They are not full-time, paid employees of the government. Indeed some may even pay a fee for the honor of being a member. The role of these member consists mainly of voting on legislation and appointments that originate elsewhere. Some may be members of specialist committees within the NPC that can make suggestions on particular policy areas but their influence is extremely limited." *Id.*

- Of the delegates, those who are members of the Standing Committee play a greater role, while the other delegates may only engage for 10 days a year and play a minimal role in lawmaking." *Id.*, at 10.

- "All of the deputies are democratically elected, either directly or indirectly by their respective constituencies with a term of five years." *Id.*, at Ex. R5.

- "All regions, ethnic groups and sectors shall have an appropriate number of deputies, as stipulated in the Electoral Law, which also makes clear requirements for the proportion of deputies elected from the grassroots level, especially workers, farmers, professionals and technicians, women and ethnic minorities." *Id.*

This evidence makes clear that Mr. Gao's NPC deputy status is entirely ceremonial, affords him no legislative authority, and provides no basis for inferring that the GOC exercises meaningful control over TCZ or TSM(SQ). Commerce's decision to dismiss this evidence—instead citing constitutional provisions that apply only to the NPC's Standing Committee—reflects a selective reading of the record that does not survive scrutiny under the substantial evidence standard. By ignoring this information, Commerce unlawfully disregarded record evidence that significantly "detracted from the weight" of its NPC analysis. *Universal Camera Corp.*, 340 U.S. at 488.

23

### D. The Record Shows that Neither the GOC nor the CCP Has Any Controlling Interest in TCZ

In addition to Mr. Gao's NPC role, Commerce relied on two ownership-based reasons to conclude that TCZ and TSM(SQ) are government "authorities": (1) the combined non-controlling shareholding of Mr. Gao and his wife at nearly 44 percent of TCZ, and (2) minority investments by two SASAC-owned entities—Dangtu Reliance Emerging Industry Fund and Shanghai Xingjing Investment Management Co., Ltd.  IDM, at 73.  Neither reason is supported by the record.

As a threshold matter, TCZ is a publicly traded company, and no individual or entity holds a controlling interest.  As of October 2024, significant portions of TCZ's equity were held by private and institutional investors, with Mr. Gao and his wife holding approximately 38 percent, a non-controlling share that is balanced by other investors.  TTL Aff. Comments, at Ex. R20.  Moreover, Trina Solar's 2023 annual report reflected Mr. Gao's direct share at just 16.2 percent.  *Id.*, at Ex. R21.  Indirect shareholding by SASAC-affiliated entities amounted to only 13.31 percent, also reflecting a non-controlling interest.  *Id.*, at Ex. R20.  Because TCZ is publicly traded, the composition of its shareholders fluctuates over time, and no single entity or individual can guarantee control over the company.

None of this information establishes that there is significant government interest amounting to GOC control over TCZ.  This Court has confirmed that conclusive evidence of government control is "where a government entity holds a majority ownership share, either directly or indirectly, in the respondent."  *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 121 F.Supp.3d 1263, 1269 (Ct. Int'l Trade 2015).  Even where an entity's chairman was appointed by a state-backed entity, Commerce still found a lack of government control where "the second largest shareholder, first vice director of the board, and general

24

manger during the POI held no apparent ties to the government, and wielded at least some amount of control over the company's production and export operations." *Id.*, at 1271. Further, evidence of government ownership alone is not dispositive; meaningful control must be affirmatively found and supported by substantial evidence. *Pt. Kenertec Power System v. United States*, 2012 WL 6123546, at 3, 5 (Ct. Int'l Trade 2021) (rejecting the Petitioner's attempts to overstate government control).

Separately, under the *2012 Public Bodies Memo* framework applicable where the government does not hold a controlling ownership interest, Commerce was required to analyze the three additional indica of control: (1) the presence of government appointed company officials; (2) the presence of government or CCP officials on the board or in management; and (3) the existence and role of a CCP committee. Commerce performed no such analysis. As demonstrated above, there is no controlling or significant government ownership in TCZ. TTL Aff. Comments, at Ex. R20. Further, the record is clear that TCZ has no government appointed company officials, no presence of government CCP officials on the board or in management, and no existence and role of any CCP committee within its publicly traded company. *Id*., at Ex. R21. Thus, Commerce's determination failed to follow its own analytical framework as directed in the *2012 Public Bodies Memo.*

In sum, the record does not support the finding that the government holds a controlling interest in TCZ, either directly or indirectly, and Commerce's reliance on Mr. Gao's shareholder status as evidence of significant CCP presence in TCZ's ownership or management is not grounded in substantial evidence.

### E. Commerce Unreasonably Concluded that TCZ Was Being Used to Carry Out Government Functions

Commerce's remaining reasons for treating TCZ and TSM(SQ) as "authorities" are similarly unavailing. Commerce concluded that TCZ's public statements regarding the implementation of certain government objectives and industry interests demonstrated that TCZ was an instrument of the GOC. IDM, at 73. Specifically, Commerce placed undue weight on TCZ's involvement in the China Photovoltaic Industry Association ("CPIA") and out-of-context statements from TCZ where it supported certain Belt and Road Initiatives ("BRI"). *Id*. In doing so, Commerce unreasonably extrapolated "meaningful control" over normal, everyday business conduct. As such, Commerce's reliance on these findings was not supported by the record.

With respect to the CPIA, Commerce asserted that Mr. Gao's involvement in the CPIA demonstrated GOC control over TCZ. Such assertion is unsupported. The CPIA is a national non-profit organization with more than 700 members, including businesses, research institutions, universities, and local photovoltaic associations engaged across the full supply chain of the PV industry. TTL Aff. Comments, at Ex. R8. This type of industry association membership is standard business practice worldwide and does not indicate government or CCP control. As this Court has recognized, the "ordinary meaning of control is to exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. U.S.*, 61 F.Supp.3d 1306, 1319 (Ct. Int'l Trade 2015). Mere governmental approval of an industry association—common for most such organizations in China—and a company executive's membership in that association do not amount to the GOC exercising restraint or influence over TCZ's operations. Commerce's analysis unlawfully conflates typical industry participation with governmental control. Under Commerce's reasoning, every company among the CPIA's 700-plus members would be deemed a government authority. Commerce has neither justified nor supported with any evidence that

26

the GOC in fact controls the business activities of those members, or TCZ in particular. As such, Commerce's reliance on TCZ's CPIA membership to support its "authorities" determination is not reasonable.

Similarly, Commerce's reliance on TCZ's limited statements for support of certain BRI policies does not equate to government control. "The record must evince indicia on the part of the considered entity of actual action or reaction, not merely the potential therefore, that may reasonably be inferred to have been the consequences of an identifiable government influence." *Borusan Mannesmann*, 61 F.Supp.3d at 1320. Commerce identified no evidence that the GOC directed TCZ's business operations, investment decisions, or pricing based on BRI policy alignment. Publicly endorsing a government initiative—as companies worldwide do with respect to their home countries' trade policies—is not evidence that the government exercises meaningful control over that company.

In short, none of Commerce's findings concerning TCZ's membership in CPIA or rhetorical support for certain BRI objectives can amount to any "meaningful control" by the GOC. No CCP officials have any controlling interest in TCZ, nor do they manage or direct TCZ's board members or business decisions. Mere participation by a publicly traded company within their country's relevant associations or stated initiatives is not substantial evidence to support a conclusion that the GOC controls an entity. Decisions resting on speculation are not supported by substantial evidence. *Solarworld Americas, Inc. v. United States*, 532 F.Supp.3d 1266, 1272 (Ct. Int'l Trade 2012) (remanding due to Commerce's speculative explanations).

For the foregoing reasons, Commerce's determination that TCZ and TSM(SQ) are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B) is unsupported by substantial evidence and contrary to law.

27

IV.    **COMMERCE'S BENCHMARK SELECTION FOR THE CROSS-BORDER PROVISION OF WAFER FOR LTAR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

In examining whether a benefit was conferred under the alleged cross-border provision of solar wafer LTAR, Commerce selected a tier two benchmark unrepresentative of the wafer input used by TTL in the production of subject merchandise.  By abandoning its reliance on a tier one benchmark, Commerce selected overbroad world export data under HTS code 3818.00, a basket category that Commerce has explicitly rejected as a wafer benchmark in prior solar proceedings.  Commerce also declined to use tier two data from Bloomberg New Energy Finance ("Bloomberg"), a product-specific source consistently used in prior solar proceedings.  Consequently, Commerce's revised benchmark produced a program-specific subsidy rate of 251.11 percent— a 1,914 percent increase from the preliminary rate of 13.09 percent, exceeding TTL's actual verified purchase price by 582 percent.  For the reasons explained below, Commerce's benchmark selection for the cross-border provision of wafers for LTAR is not supported by the record.

    **A.  Factual Background**

In the underlying proceeding, interested parties submitted both tier one and tier two benchmarks for the purposes of Commerce's benefit calculation for the alleged cross-border provision of Chinese wafer for LTAR.  As tier one benchmarks, TTL submitted data statistics compiled by the RTG showing actual domestic prices from the Thai integrated circuit industry representing similar merchandise.  *See* TTL Response, "Question 3 of New Subsidy Allegation Questionnaire," at Exhibit 1 (Oct. 11, 2024) ("TTL Wafer NSA Benchmarks"), P.R. 547, C.R. 246.  The RTG also submitted Thai import data classifiable under HTS 2804.61.00, 2804.69.00, and 3818.00 from Thai customs data.  RTG Response, "New Subsidy Allegation Supplemental Questionnaire," at 3, Ex. RTG NSA-1 (Oct. 8, 2024), P.R. 534.  Using this data, TTL also

28

submitted a refined import dataset showing imports from only solar wafer producing countries. *See* TTL Case Brief, at Attach. II-C (Mar. 12, 2025) ("TTL Case Brief"), P.R. 686, C.R. 332. Finally, TTL also submitted a tier two global benchmark from Bloomberg showing weekly average prices during the POI of monocrystalline wafers—the exact input used by TTL in its production of subject merchandise. *Id*., at Exhibit 2.

In its post-preliminary analysis, Commerce relied on a tier one benchmark using annual import data, exclusive of Chinese imports, from the RTG under HTS codes 2804.61.00, 2804.69.00, and 3818.00. Post-Prelim LTAR Memo, at 11. Commerce then compared the benchmark price to TTL's individual purchases prices of wafer to measure the benefit received. *Id*., at 16. Commerce preliminary calculated a total subsidy amount of 13.09 percent for the cross-border provision of silicon wafer for LTAR. TTL's total subsidy rate increased from 0.14 percent in the *Preliminary Determination* to 13.59 percent based on Commerce's post-preliminary LTAR analysis. *See Preliminary Determination*, at 80,875; Post-Prelim LTAR Memo, at Attach. 2.

Commerce abandoned its reliance on a tier one wafer benchmark in the *Final Determination*, finding that because "the goods from the government provider (China) constitutes a majority of the Thai market. . . it is reasonable to conclude that actual transaction prices, including imports, in the country in question are significantly distorted as a result of the government's involvement." IDM, at 49. Instead, Commerce adopted a tier two benchmark by using Comtrade world export prices for silicon wafers under HTS 3818.00. *Id*., at 51. Commerce declined to rely on the Bloomberg wafer prices, finding that "there is no mechanism for Commerce to remove. . . Chinese prices from the BloombergNEF data." *Id*., at 50. Further, Commerce excluded prices from Thailand, Cambodia, and Vietnam from the data due to alleged

market "distortions," but, aside from general citations to companion investigations, Commerce did not specify or explain the cause of such distortions. *Id*. In response to arguments that world export data under HTS 3818.00 was overbroad and represented prices of products entirely dissimilar to solar wafers, Commerce explained that:

> {T}he legal requirements governing Commerce's section of benchmarks do not require perfection. As we have explained in other proceedings, a benchmark, by nature is not an exact match to the subsidy being evaluated. Rather, we look to whether a benchmark is comparable based on the record and, thus, is usable.

IDM, at 52. Consequently, Commerce's revised benchmark resulted in program-specific subsidy rate of 251.11 percent, reflecting a **1,914 percent** increase from its preliminary subsidy rate of 13.09 percent. Final Calc Memo, at Attach. 1.

## B. Legal Background

In determining whether a government has provided a good or service for adequate remuneration, Commerce will compare the government price to a market-based benchmark price. *See* 19 C.F.R. § 351.511(a)(2). Under the regulation's established three-tier hierarchy, Commerce first prefers to select a "tier one" benchmark market price based on actual transactions or imports within the country under investigation, *i.e.*, Thailand. *Id*. § 351.511(a)(2)(i).

If no usable tier one benchmark is available, Commerce turns to a "tier two" benchmark by comparing the government price to a world market price, provided it is reasonable to conclude that such a price would be available to purchasers in the country under investigation. *Id*. § 351.511(a)(2)(ii). Only when world market prices are likewise unavailable may Commerce resort to a "tier three" benchmark, which assesses whether the government price is consistent with market principles. *Id*. § 351.511(a)(2)(iii).

When selecting among benchmarks, Commerce must consider "product similarity; quantities sold or imported; and other factors affecting comparability." *Id.*; *see also Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1295 (Ct. Int'l Trade 2020) (sustaining Commerce's remand determination to select a particular benchmark source because it was "specific to the inputs used by the parties"). The Federal Circuit has similarly found that Commerce's selected remuneration benchmark must be "comparable" to the input used in the production of subject merchandise." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273–74 (Fed. Cir. 2012). Finally, this Court has previously remanded aberrational import data where Commerce's selected benchmark was three times higher than the input it was attempting to value. *An Giang Fisheries Import and Export Joint Stock Company v. United States*, 179 F.Supp.3d 1256, 1275 (Ct. Int'l Trade 2016) (remanding for Commerce to explain why it selected an aberrational, high surrogate value).

### C. Commerce's Determination to Disregard Tier One Benchmark Information is Unsupported by Substantial Evidence

Commerce's sole stated basis for rejecting its preferred tier one benchmark was that Thailand's silicon wafer market is distorted by its dependence on Chinese imports. IDM, at 49. That finding, however, rests entirely on import *quantity* data and is directly contradicted by the import *price* data on the record. During the POI, Thai imports of HTS 3818.00 from China averaged $57.5/kg, while imports from the rest of the world averaged $109.04/kg, nearly 90 percent higher. Post-Prelim LTAR Memo, at Attach. I; TTL Case Brief, at Attach. II.A. Even when limiting non-Chinese imports to countries with known solar wafer production, the average price of $102.67/kg remains 78 percent higher than the Chinese import price. *Id*. The presence of substantial non-Chinese imports at prices nearly double those of Chinese imports is inconsistent with a finding of market-wide distortion. If Chinese prices were suppressing the

31

Thai market, non-Chinese import prices would reflect that pressure. They do not. The record therefore provides no basis from which one could reasonably conclude that actual transactions in Thailand are significantly distorted by the GOC's involvement.

Commerce's exclusion of other non-China markets, including Vietnam, Cambodia, and Thailand itself, on "market distortion" grounds is similarly flawed. Commerce offered nothing beyond a cross-reference to concurrent investigations, without any specific findings or analysis explaining how those markets were distorted in a manner that would render their prices unusable. IDM, at 50. That bare assertion does not satisfy the "reasonably discernible" explanation the law requires. *NMB Singapore Ltd.*, 557 F.3d at 1319.

Rather than abandoning tier one data entirely, Commerce would have better satisfied the mandate for benchmark comparability in its post-preliminary benchmark by limiting the Thai import data to countries with known solar wafer production and averaging the result with actual purchase prices for comparable merchandise. *See* TTL Case Brief, at Attach. II-C.

### D. Commerce's Tier Two Benchmark Selection for Silicon Wafer is Unsupported by Substantial Evidence

In selecting a tier two benchmark, Commerce relied on world export data under HTS code 3818.00, which encompasses a basket category of products wholly dissimilar to solar-grade wafers. Final Calc Memo, at Attach. 1. HTS code 3818.00 is defined as "Chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics." *See* Comments from TTL, "Rebuttal Comments to Commerce's March 6, 2025, memorandum "Placing UN Comtrade Data on the Record," at Ex. 2A (Mar. 10, 2026) ("TTL Mar. 10 Rebuttal"), P.R. 674, C.R. 323. As a threshold matter, this classification covers dozens of products that have no solar-grade polysilicon content. The record shows that HTS code 3818.00 includes resin pastes, nickel pellets, CT-50 cans, rux hardener, crystal

32

substrates, tin concentrates, cleanroom lotions, alkaline detergents, and copper alloy chemical particles, etc. *See* Comments from TTL, "Rebuttal Comments to Petitioner's Comments on TTL's NSA Questionnaire Response," at Exs. 2 and 3 (Nov. 4, 2024) ("TTL Nov. 4 Comments"), P.R. 587, C.R. 262. (showing Japan as a large exporter of resin paste; and Singapore as a large exporter of tin concentrate, nickel pellets, and slototin additives). TTL also submitted information from Clean Energy Associates ("CEA") demonstrating that HTS code 3818.00 includes imports of both PV-grade wafers and electronics-grade ("EG") wafers. *See* TTL Mar. 10 Rebuttal, at Ex. 3. PV-grade wafers are used for solar cells, and electronics-grade wafers are used in semiconductors wafers, applicable to a variety of electronics products. *Id*. Therein, CEA explained that "PV and EG wafers have massively different price points, given the differences in manufacturing specifications and end-use tolerance for failure and purity; the two products should not be compared or intermingled when determining a fair market value." *Id*. Export data under HTS 3818.00 therefore captures the average unit values of a wide range of chemical products and EG grade wafers.

In prior cases, Commerce itself has explicitly rejected data under HTS 3818.00 as a solar wafer benchmark, determining that the HTS classification is too broad and unrepresentative of solar wafers:

> The HTS category covering silicon wafers – HTS 3818 (chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics) – is not further itemized and covers a wide range of products that may not specifically reflect the cost of solar-grade wafers.
>
> Also, wafers for solar cells are primarily made of polysilicon. In the investigation and first five administrative reviews of this proceeding, we found that differences in silicon purity levels can result in significant price differences. Therefore, in each of these segments of the proceeding, we relied on international prices in valuing either polysilicon or wafers, or both. Given the wide range of products covered by the Malaysian HTS number for wafers, it is more likely that the

33

> Malaysian imports include products with a silicon purity level that significantly differs from the silicon purity level required for wafers used to manufacture solar cells.

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg. 7,531 (Feb 10, 2020) (preliminary results of AD review), and Preliminary Decision Memorandum (Jan. 31, 2020), at 25–26.

> The Thai HTS category covering silicon wafers – HTS 3818 (chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics) – is not further itemized and covers a wide range of products that may not specifically reflect the cost of solar-grade wafers.

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 83 Fed. Reg. 67,222, 67,223 (Dec. 28, 2018) (preliminary AD results), and accompanying Preliminary Decision Memorandum (Dec. 20, 2018).  Here, the world export data relied on by Commerce similarly covered a wide range of chemical products that vary widely in price points.  Consistent with its determination in prior solar proceedings, Commerce should not have relied on import data under HTS 3818.00 here to value wafer inputs.

To determine whether a potential world market price on the record refers to a comparable good, Commerce must have adequate information concerning the makeup of the benchmark in question.  Here, the underlying export data used by Commerce included high-priced outliers, further revealing its unreliability as a benchmark for Commerce's benefit calculation.  After excluding prominent wafer producing countries due to alleged distortions, *i.e.*, Vietnam, Cambodia, and Thailand, and excluding few non-wafer producing countries, Commerce's data pool only contained export information from seven countries—Germany, Japan, Malaysia, Norway, the Philippines, Singapore, and Turkey.  Critically, the record shows that each of these countries has less than 1 GW of solar wafer capacity.  *See* Pet. NSA, at Ex. NSA-9, pp. 33. Thus, Commerce's limited dataset reflected average unit values of HTS 3818.00 imports from

countries with very limited wafer production, with values ranging from $524.82/kg to $712.67/kg. Final Calc Memo, at Attach. 1. By comparison, TTL's actual average purchase price during the POI was $[    ]/kg. *Id.*, at Attach 2.[1] The underlying export data included specialized, low volume and high-value products resulting in average unit values of over $10,000/kg, thereby dramatically skewing the average unit value higher. *Id.* Consequently, because the underlying data included such aberrational values, Commerce's benchmark selection represented a **582 percent** increase from TTL's actual purchase prices, resulting in a 251.11 percent subsidy rate under this program alone. In doing so, Commerce unlawfully failed to address the aberrational nature of its benchmark selection. *Tri Union Frozen Products, Inc. v. United States*, 227 F.Supp.3d 1387, 1396 (Ct. Int'l Trade 2017) ("Commerce is being asked to follow its practice, which instructs the agency not to rely on aberrational or unreliable surrogate data").

Under 19 C.F.R. § 351.511(a)(2)(i), Commerce is required to consider "product similarity" and other factors affecting comparability. Here, in response to arguments that export data under HTS 3818.00 is unrepresentative of solar wafer values, Commerce asserted that its "selection of benchmarks do not require perfection" and that the benchmark "is not an exact match to the subsidy being evaluated." IDM, at 52. Yet, Commerce ignores that a benchmark must *still* be comparable and specific to the input being valued, as required by the regulation and Court precedent. Here, Commerce selected a tier two benchmark, reflecting a 238.02 percent increase from its post-preliminary subsidy rate of 13.09 percent. This aberration alone should have revealed to Commerce the unreliability of HTS 3818.00 world export data as a benchmark

---

[1] TTL's purchase price already reflected a premium price for wafer because all its polysilicon was sourced from [    ], and not China. *See* TTL Response, "Section III Questionnaire Response," at Ex. 21 (Aug. 19, 2024), P.R. 279, C.R. 146.

for valuing the specific input in question.  When a benchmark price differs from actual, verified purchase prices by an exponential factor, it fails to represent a suitable benchmark.  *See Maverick Tube Corp. v U.S.*, 2015 WL 3706539, at 5 (Ct. Int'l Trade 2015) (finding Commerce's benchmark inconsistent with commercial reality when it was twice as high as the producer's own cost of production); *see also RZBC Group Shareholding Co., Ltd. v. U.S.*, 100 F.Supp.3d 1288 (Ct. Int'l Trade 2015) (remanding distortive benchmarks, finding that "{h}igh prices from small transactions can balloon the average to absurd proportions,").  Because the basket categories included in the Comtrade dataset reflect a broad category of merchandise than the inputs in question — which was directly acknowledged by Commerce — its determination that HTS 3818.00 world export data meets the product comparability requirement is unsupported by substantial evidence.  *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F.Supp.3d 1316, 1333 (Ct. Int'l Trade 2018) (Commerce's decision to average the Comtrade and IHS datasets without properly considering whether the Comtrade data was too flawed to be probative of the world market price for the input at issue renders the decision unsupported by substantial evidence.").

Finally, Commerce's rejection of product-specific Bloomberg data is unsupported by established prior precedent where Bloomberg was consistently a surrogate source for valuing wafer prices.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 88 Fed. Reg. 1,355 (Jan. 10, 2023) ("*Solar Cells 2020 CVD Final Results*") (unchanged in final) and accompanying Preliminary Decision Memorandum, at 28; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China*, 88 Fed. Reg. 88,575 (Dec. 22, 2023) ("*Solar Cells 2021 CVD Prelim Results*") (unchanged in final), and Preliminary Memorandum at 23

("consistent with our practice of seeking to maintain product comparability. . . we are using the world market prices (tier two) published by Bloomberg Prices to derive the world market silicon wafer benchmark prices because they are specific to silicon wafers."). In its Final Determination here, Commerce failed to sufficiently explain its departure from its past practice to rely on Bloomberg data to calculate a comparable benchmark for silicon wafers. IDM, at 50.

Taken together, Commerce unlawfully relied on aberrational and unrepresentative world export data under HTS 3818.00 to value TTL's solar wafer inputs. In doing so, Commerce unlawfully disregarded record evidence that significantly "detracted from the weight" of its market price selection by failing to account for such aberrations, and by not selecting more representative tier one and two benchmarks. *Universal Camera Corp.*, 340 U.S. at 488. Further, by failing to scrutinize a benchmark that produced a commercially impossible result, *i.e.*, a 582 percent markup from the input price, Commerce's decision was unreasonable. Any agency action that is unreasonable given the record as a whole cannot be supported by substantial evidence. *Fuwei Films (Shandong) Co., Ltd. v. U.S.*, 837 F.Supp.2d 1347, 1350 (Ct. Int'l Trade 2012) ("{T}he court analyzes whether the challenged agency action was reasonable given the circumstances presented by the whole record.") (internal quotations omitted).

## V.  COMMERCE'S BENCHMARK SELECTION FOR THE CROSS-BORDER PROVISION OF SOLAR GLASS FOR LTAR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

The record does not support Commerce's final determination to abandon tier one benchmark information in favor of a non-specific, non-comparable tier two benchmark for purposes of its benefit calculation under the cross-border provision of Chinese solar glass for LTAR. Commerce's determination that TTL's actual purchase prices were unusable due to alleged market distortions is unsupported by substantial evidence because Commerce failed to provide a substantiated explanation for such distortions. Moreover, even assuming arguendo that

resorting to a tier two benchmark was warranted, Commerce's selection of UN Comtrade world export prices under the overly broad HS code 7007.19 independently failed to satisfy the product-specificity requirements under the applicable regulations. *See* 19 C.F.R. § 351.511(a)(2). This deficiency is especially pronounced given that data from PV Insights, a tier two benchmark specific to solar glass, exclusive of Chinese prices, and consistently relied upon and affirmed in prior solar proceedings, was available on the record and disregarded for reasons that are contradicted by the record itself. For these reasons, Commerce's benchmark selection for the cross-border provision of solar glass was not supported by substantial evidence.

## A. Factual Background

In the underlying proceeding, TTL similarly submitted both tier one and tier two benchmarks for Commerce's benefit calculation under the alleged cross-border provision of solar glass from China for LTAR. As preferrable tier one information, TTL submitted its actual purchases of solar glass during the POI from suppliers in [                                        ]. Response from TTL, "New Subsidy Allegation Questionnaire on Solar Glass and Silver Paste," at Ex. NSA3-3.1 (Nov. 8, 2024) ("TTL NSA Glass Info"), P.R. 595, C.R. 266–269. As tier two information, TTL submitted pricing data from PV Insights, a reputable market research firm that provides prices for privately traded solar photovoltaic components based on interview analysis of the anti-reflective glass market. *Id.*, at NSA3-6; Ex. NSA3-3.2. This data reflected non-Chinese prices specific to the type of solar glass used by TTL in the production of solar modules. *Id.*

In its post-preliminary analysis, Commerce relied on a tier one benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(i), using TTL's own monthly purchases of imported solar glass from unaffiliated, non-Chinese suppliers. *See* Post-Prelim Calc Memo, at 2. In doing so, Commerce declined to rely on the Petitioner's proposed global benchmark import data, explaining that "the

38

HS category submitted by the {Royal Thai Government} include products other than solar glass (*e.g.*, ground glass), we preliminary determine that certain of TTL's purchases of imported solar glass serve as the most comparable tier one benchmarks available on the record." Post-Prelim LTAR Memo, at 14. Commerce compared those monthly benchmark prices against TTL's individual purchase prices of solar glass to measure the benefit received, and preliminary calculated a total subsidy amount of 0.34% under this program. *Id*., at 18–19.

Commerce reversed course in the *Final Determination*. Commerce abandoned its reliance on a tier one benchmark and shifted instead to a tier two benchmark, concluding that Thailand's solar glass market was significantly distorted due to the RTG's reporting that Thailand has no domestic solar glass production and depends on imports. IDM, at 56. Relying on the Petitioner's submission, Commerce further reasoned that because "GOC-controlled companies account for at least 71 percent of solar glass production in China," Chinese purchase prices into Thailand are therefore distortive. IDM, at 57. Without providing any detailed reasoning or explanation, and citing only to concurrent investigation proceedings, Commerce also declined to rely on solar glass pricing from Thailand, Cambodia, Vietnam, and Malaysia. *Id*., at 58.

Rather than using TTL's actual non-Chinese solar glass purchase prices as a tier one benchmark, or PV Insights as a tier two benchmark, Commerce selected the Petitioner's proposed source of Comtrade 2023 world export prices under HTS code 7007.19, exclusive of China, Thailand, Vietnam, and Cambodia. IDM, at 58–59. In response to TTL's arguments that this overbroad Comtrade export data was a wholly unsuitable benchmark for valuing solar glass, Commerce again asserted that "the legal requirements governing Commerce's selection of benchmarks do not require perfection. As we have explained in other proceedings, a benchmark,

39

by nature, is not an exact match to the subsidy being evaluated." IDM, at 59. Commerce rejected PV Insights data on the ground that there is "no mechanism for Commerce to remove solar glass prices from the subsidy provider, China, or producers of solar glass in specific markets that Commerce is finding to be distorted." IDM, at 58. Consequently, Commerce's revised benchmark resulted in program-specific subsidy rate of 12.47%, reflecting a **3,568%** increase from its preliminary subsidy rate of 0.34%. Final Calc Memo, at Attach. 1.

### B. Commerce's Rejection of Non-Distortive Tier One Benchmark Data in Favor of Unrepresentative Tier Two Data is Not Supported by Substantial Evidence

Commerce's rejection of TTL's actual solar glass purchase prices—representing a preferred tier one benchmark —was unreasonable because Commerce failed to provide a "reasonably discernable" explanation that Chinese, Malaysian, and Vietnam markets were distorted in a manner that preclude their use. *NMB Singapore*, 557 F.3d at 1319. A finding of market "distortion" requires more than a citation to a high percentage of imports and a cross-reference to companion proceedings currently on appeal. IDM, at 58.

Commerce's distortion finding for China is also factually flawed. Commerce concluded that "China accounted for approximately 79.9 percent of Thailand's solar glass imports by quantity during the POI." IDM, at 57 (citing Pet. Glass/Paste NSA, at Exhibit NSA2-24), but this figure is drawn from the Petitioner's import data under the overly broad HTS code 7007.19, a catch-all category covering all types of safety and tempered glass, not solar glass specifically. *See* Response from TTL, "Rebuttal benchmark Information for Solar Glass and Silver Paste," at 2–10, Exs. GLASS-1 to GLASS-9 (Nov. 27, 2024) ("TTL Glass Rebuttal") P.R.614–617. Commerce's assertion that China dominates *solar* glass imports specifically, is therefore inaccurate. Commerce improperly conflated broad HTS-category import statistics with the specific solar glass inputs at issue, and used that conflation to discard an otherwise valid tier one

40

benchmark without adequate justification. Instead, TTL's purchases of [

] of solar glass from unaffiliated suppliers was the most comparable

tier one benchmark Commerce should have utilized for its benefit calculation. TTL NSA Glass

Info, at Ex. NSA3-3.

As an alternative, Commerce used a tier two benchmark from Comtrade world export

data under HTS 7007.19. IDM, at 58. HTS code 7007.19 is defined as: "Glass; safety glass,

toughened (tempered), (not of a size and shape suitable for incorporation in vehicles, aircraft,

spacecraft or vessels)" including glass "Suitable for machinery of heading 84.29 or 84.30" which

covers glass used in construction equipment, including bulldozers, excavators, and snowplows.

TTL Glass Rebuttal, at Ex. GLASS-1. Safety glass for construction equipment is clearly not

specific to solar glass. HTS code 7007.19 also includes safety and tempered glass for doors,

windows, shower cabins, all household appliances, tabletops, sunroof glass, cell phone screens,

cell phone camera glass, glass for iPADs, etc., as further confirmed by U.S. and European Union

customs rulings. *Id.*, at Exs. GLASS-2, GLASS-3, and GLASS-4. Commerce has previously

rejected HTS code 7007.19 for solar glass in a past solar CVD proceeding as too broad, noting

that "HTS 7007.19 is s a basket category for tempered glass titled 'Other.' Although the UN

Comtrade dataset may include prices for solar glass, it includes prices for a broader array of

tempered products." *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the People's Republic of China*, 87 Fed. Reg. 40,491 (Jul. 7, 2022) ("*Solar Cells

2019 Final CVD Results*") and accompanying Issues and Decision Memorandum (Jun. 9, 2022),

at comment 8.

Commerce's contention that its chosen benchmarks "do not require perfection" and that

the benchmark "is not an exact match to the subsidy being evaluated," cannot justify the

41

selection of a benchmark that fails to meet the product similarity requirements under its own regulations. *See* 19 C.F.R. § 351.511(a)(2)(i).  To measure the adequacy of remuneration, Commerce must "compare{} the respondent's reported costs for the *input* in question { . . . } with the calculated benchmark price, which is representative of the market price for the good at issue." *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1356, n.9 (Ct. Int'l Trade 2015) (emphasis added).  A benchmark drawn from a basket category covering dozens of dissimilar glass products cannot, by definition, be "representative of the market price" for solar glass specifically.  Commerce's invocation of the "no perfection required" standard does not transform an unrepresentative, overinclusive benchmark into a lawful one.  Accordingly, Commerce's reliance on HTS 7007.19 Comtrade data fails to satisfy the applicable regulatory requirements.

### C. Commerce's Rejection of PV Insights Data as a Tier Two Benchmark Contradicts Record Evidence

In the final determination, Commerce declined to rely on PV Insights as a tier two benchmark, finding there to be "no mechanism" for Commerce to remove prices from allegedly distorted markets, including China, Vietnam, and Malaysia.  IDM, at 58.  That finding is flatly contradicted by the record and reflects a mischaracterization of the PV Insights data.

PV Insights reports solar glass prices on a global basis, with prices from China and non-China sources broken out separately.  The data table itself includes an explicit "Non-China" price column, making it straightforward to exclude Chinese prices from any benchmark calculation.  TTL NSA Glass Info, at Ex. NSA3-3.2.  No reasonable reading of the record supports Commerce's assertion that there was no mechanism for removing Chinese prices from the PV Insights data.  Commerce's stated concern that the dataset might also incorporate prices from Thailand, Cambodia, Vietnam, or Malaysia was purely speculative and unsupported by any

identified record evidence. *See Solarworld Americas*, 532 F.Supp.3d at 1272. In fact, prices

from PV Insights are similar to verified prices for non-Chinese solar glass from TTL's

unaffiliated suppliers of [                                        ], further

demonstrating the reliability of PV Insights data as a suitable tier two benchmark. TTL NSA

Glass Info, at Ex. NSA3-3.2.

In addition, Commerce's rejection of the PV Insights data here contradicts years of

precedent in solar proceedings. In several prior administrative reviews of the countervailing duty

order *Solar Cells from China*, Commerce consistently selected PV Insights over HTS-based

import trade data as a benchmark source for valuing solar glass.[2] Commerce's reliance on PV

Insights was further affirmed by the U.S. Court of International Trade. *See Changzhou Trina

Solar Energy*, 466 F.Supp.3d at 1295–96. Taken together, Commerce had no reason to rely on

overinclusive and unspecific HTS-based import data when PV Insights provides reliable global

pricing data, specific to the input in question, with an established record of superiority. The

---

[2] *See e.g.*, *Solar Cells 2021 CVD Prelim Results*, and accompanying Preliminary Decision
Memorandum (Dec. 18, 2023), at p. 22 (selecting solar glass data from PV Insights, finding that
"{b}ecause the data published by 2021 PV Insights provide global monthly prices that are specific to
solar glass, we find it appropriate to rely on this source for valuing respondents' purchases of solar glass,
as we have in previous administrative reviews.");

*Solar Cells 2020 CVD Final Results*, and accompanying Preliminary Decision Memorandum (Jan. 3,
2023), at 27 ("{c}onsistent with our practice of. . . relying on data that reflect the narrowest category of
products encompassing the input products, we are using the world market prices (tier two) published by
PV Insights.");

*Solar Cells 2019 Final CVD Results*, and accompanying Issues and Decision Memorandum (June 29,
2022), Comment 8, at p. 51 (Commerce rejected HTS-based import data, finding that "PV Insights prices
are specific to solar glass and that the UN Comtrade prices are not");

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China*, 86 Fed. Reg. 21,691 (Apr. 23, 2021) (preliminary results of CVD review)
and accompanying Preliminary Decision Memorandum (Apr. 19, 2021), at 19 ( "{b}ecause the data
published by PV Insights are global monthly prices for the entire POR and are specific to solar glass, we
find that it is appropriate to rely on this data source when constructing the solar glass benchmark.");

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China*, 85 Fed. Reg. 79,163 (Dec. 9, 2020) (final results of CVD review) and
accompanying Issues and Decision Memorandum (Nov. 27, 2020), at Cmt. 7 (selecting PV Insights as a
benchmark for solar glass).

Court has further reaffirmed that product-specific industry publications possess better comparability than Comtrade data that encompasses a broader range of products which may not be specific enough to serve as an accurate benchmark. *See Canadian Solar Inc. v. United States*, Slip Op. 20-149, at 4, 2020 WL 6129754 (Ct. Int'l Trade 2020), (stating, "{t}he court has previously faulted Commerce for failing to account for 'factors affecting comparability' as required by 19 C.F.R. § 351.511(a)(2)(ii) in choosing datasets to set its. . . benchmark." (internal citation omitted)).

In short, Commerce had no sound basis to discard either TTL's actual tier one purchase prices or the tier two PV Insights data, both of which are precisely specific to the solar glass inputs at issue, in favor of overbroad Comtrade export data that Commerce itself previously found to be unsuitable for this purpose. Commerce's benchmark selection for the benefit calculation under the cross-border provision of Chinese solar glass for LTAR is therefore not supported by substantial evidence.

## VI.    COMMERCE'S REFUSAL TO INVESTIGATE THE CROSS-BORDER PROVISION OF WAFER FOR LTAR IN MALAYSIA WHILE INVESTIGATING THE SAME PROGRAM IN THAILAND WAS AN ABUSE OF DISCRETION

The Petitioner, which includes Hanwha Qcells, alleged cross-border provision of wafer for LTAR against Thailand, Cambodia, and Vietnam. IDM, at 50–51; TTL Nov. 4 Comments, at 2–3. The Petitioner did not file a similar allegation against Malaysia, where Hanwha's own foreign affiliate was a mandatory respondent and itself sources Chinese wafers.[3] Commerce was aware that Hanwha Qcells sources wafers from China. *See* TTL Case Brief, at 25–26, *citing*

---

[3] *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419, 57,449 (Aug 23, 2023) (Commerce's circumvention findings reference solar cells and modules "{p}roduced in Malaysia by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in the People's Republic of China").

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation and Preliminary Results of Changed Circumstances Review*, 89 Fed. Reg. 53,388, 53,390 (Jun. 26, 2024) (Commerce explained "these new input suppliers are ….providing Chinese-origin wafers …. for Hanwha's production in Malaysia.").

Commerce's own regulation independently compels it to investigate the cross-border provision of wafers for LTAR in Malaysia.  Under 19 C.F.R. § 351.311(b), if Commerce "discovers a practice that appears to provide a countervailable subsidy with respect to the subject merchandise and the practice was not alleged or examined in the proceeding . . . the Secretary will examine the practice, subsidy, or subsidy program."  Thus, Commerce has the authority and obligation to investigate subsidy programs even where they are not alleged by the petitioner.  Commerce's investigation of the provision of wafer for LTAR in Thailand while declining to do so for Malaysia was an abuse of discretion.  Commerce may not treat materially similar situations differently without adequate explanation.  *Dongbu Steel Co. v. United States,* 635 F.3d 1363, 1371 (Fed. Cir. 2011) ("{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."); *see also NSK Ltd. v. United States*, 390 F.3d 1352, 1357-58 (Fed. Cir. 2004) (rejecting as internally inconsistent a Commerce determination applying different standards to like circumstances).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this Memorandum.

**NON-CONFIDENTIAL VERSION**

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

Dated:  June 10, 2026                    Counsel for Plaintiffs *TTL and MLT*

46

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that the Memorandum of Law in Support of Plaintiffs' Motion for Judgment Upon the Agency Record, dated June 10, 2026, complies with the word-count limitation described in the Standard Chambers Procedures and Scheduling Order. The Memorandum of Law contains 13,973 words according to the word-count function of the word-processing software used to prepare the Memorandum.

Respectfully submitted,

/s/ Jonathan M. Freed

Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar Science & Technology (Thailand) Ltd. and M.L.T. Solar Energy Products Co., Ltd.*

Dated: June 10, 2026