IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD., <br><br> Plaintiffs and Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Consol. Ct. No. 25-161 |

**CANADIAN SOLAR PLAINTIFFS' RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiffs, Consolidated Plaintiff-Intervenors, and Consolidated Defendant-Intervenors Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd., and Canadian Solar US Module Manufacturing Corporation (together, "Canadian Solar" or "Plaintiffs") respectfully submit this Motion for Judgment on the Agency Record in accordance with Rule 56.2 of the Rules of the United States Court of International Trade.  For the reasons set forth in the enclosed brief, this Court should reverse the erroneous determination of the United States Department of Commerce in its countervailing duty investigation of crystalline silicon

- 1 -

photovoltaic cells, whether or not assembled into modules, from Thailand, and remand with instructions to recalculate the margin applicable to Canadian Solar in a manner consistent with this Motion and the Court's findings. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2025), and accompanying Issues and Decision Memorandum (Apr. 18, 2025).

Plaintiffs respectfully request, for the reasons explained in the accompanying brief, that this Court hold that the contested portions of the final determination are unsupported by substantial evidence and otherwise unlawful. Plaintiffs further request that the Court remand this matter to the U.S. Department of Commerce for disposition consistent with the Order and Opinion of the Court. A proposed order is attached.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Joshua E. Kurland
Michael G. Jacobson
Nicholas R. Sparks
Lindsay K. Brown

**HOGAN LOVELLS US LLP**
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd., and Canadian Solar US Module Manufacturing Corporation*

Dated: June 10, 2026

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD.,<br><br>       Plaintiffs and Consolidated Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br><br>       Defendant-Intervenor. | Consol. Ct. No. 25-161 |

**PROPOSED ORDER**

Upon consideration of the Motion for Judgment on the Agency Record filed by Plaintiffs, Consolidated Plaintiff-Intervenors, and Consolidated Defendant-Intervenors Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd., and Canadian Solar US Module Manufacturing Corporation (together, "Plaintiffs"), and upon all other papers and proceedings had herein, it is hereby

**ORDERED** that Plaintiffs' Motion for Judgment on the Agency Record is granted; and it is further

1

2

**ORDERED** that this action is remanded to the U.S. Department of Commerce for the agency to issue a redetermination consistent with this Court's Opinion and Order; and it is further

**ORDERED** that the U.S. Department of Commerce shall file its remand determination with the Court within 90 days of this date.

**SO ORDERED.**


_____, Judge

Dated: _____, 2026
       New York, New York

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD.,<br><br>        Plaintiffs and Consolidated Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>  and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br><br>        Defendant-Intervenor. | Consol. Ct. No. 25-161 |

**CANADIAN SOLAR PLAINTIFFS' RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd., and Canadian Solar US Module Manufacturing Corporation*

June 10, 2026

**TABLE OF CONTENTS**

Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

I.     Administrative Determination Under Review .............................................. 2

II.    Statement of the Issues................................................................................ 2

STATEMENT OF FACTS ......................................................................................... 3

SUMMARY OF THE ARGUMENT ......................................................................... 8

ARGUMENT ............................................................................................................. 9

I.     STANDARD OF REVIEW .......................................................................... 9

II.    CANADIAN SOLAR AGREES WITH AND INCORPORATES BY REFERENCE
       ALL ARGUMENTS RAISED BY MANDATORY THAI RESPONDENT TTL............ 10

III.   COMMERCE'S DETERMINATION TO APPLY COUNTERVAILING DUTIES
       TO ALLEGED TRANSNATIONAL SUBSIDY PROGRAMS IS UNLAWFUL ........... 14

       A.    The Statute's Plain Language Prohibits Transnational Subsidy Investigations.... 14

       B.    The Statute's Basic Definitions of Countervailing Duties Are All Oriented
             Toward A Specific Country.............................................................................. 17

       C.    Multiple Other Aspects of the Statute Contradict Commerce's Interpretation ..... 18

       D.    The Legislative History of the Definition of "Subsidy" Further Demonstrates
             that Congress Did Not Intend for Transnational Subsidies To Be
             Countervailable .............................................................................................. 23

       E.    Commerce's Findings that the Alleged Transnational Subsidies Were Specific
             Is Unsupported by Substantial Evidence and Otherwise Not in Accordance
             with Law ......................................................................................................... 27

CONCLUSION.......................................................................................................... 29

# TABLE OF AUTHORITIES

Page

**CASES**

*Arista Networks, Inc. v. Cisco Sys.*,
   908 F.3d 792 (Fed. Cir. 2018) ...................................................................... 16, 24, 28

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) ...................................................................................... 14

*Ceramica Regiomontana, S.A. v. United States*,
   64 F.3d 1579 (Fed. Cir. 1995) ...................................................................... 24

*Changzhou Trina Solar Energy Co. v. United States*,
   975 F.3d 1318 (Fed. Cir. 2020) .................................................................... 27

*Chevron, U.S.A., Inc. v. NRDC, Inc*,
   467 U.S. 837 (1984) ...................................................................................... 9, 10

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ...................................................................................... 9

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers*,
   *AFL-CIO*, 6 F.3d 1511 (Fed. Cir. 1993) ...................................................... 9

*Dunn v. Commodity Futures Trading Com'n*,
   519 U.S. 465 (1997) ...................................................................................... 10

*Esteras v. United States*,
   606 U.S. 185 (2025) ...................................................................................... 21

*Gallant Ocean (Thailand) Co. v. United States*,
   602 F.3d 1319 (Fed. Cir. 2010) .................................................................... 9

*GPX International Tire Corp. v. United States*,
   666 F.3d 732 (Fed. Cir. 2011) ...................................................................... 16

*Huaiyin Foreign Trade Corp. (30) v. United States*,
   322 F.3d 1369 (Fed. Cir. 2003) .................................................................... 9

*Hyundai Steel Co. v. United States*,
   798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) .............................................. 10

*King v. Burwell*,
   576 U.S. 473 (2015)................................................................................................ 16

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)................................................................................................ 14

*Learning Resources, Inc. v. Trump*,
   607 U.S. __, 146 S. Ct. 628 (2026).......................................................................... 23

*Loper Bright Enterprises et al. v. Raimondo*,
   603 U.S. 369 (2024)............................................................................. 9, 10, 15, 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................................. 22

*NLRB v. Columbian Enameling & Stamping Co.*,
   306 U.S. 292 (1939)................................................................................................. 9

*Pesquera Mares Australes v. United States*,
   266 F.3d 1372 (Fed. Cir. 2001)............................................................................... 10

*SKF USA Inc. v. United States*,
   263 F.3d 1369 (Fed. Cir. 2001)............................................................................... 13

*Timex V.I., Inc. v. United States*,
   157 F.3d 879 (Fed. Cir. 1998)................................................................................. 10

*United States v. Wise*,
   370 U.S. 405 (1962)................................................................................................ 26

*Utility Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014)................................................................................................ 20

*Ventas, Inc. v. United States*,
   381 F.3d 1156 (Fed. Cir. 2004) .............................................................................. 21

*Ventura Coastal, LLC v. United States*,
   736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) ......................................................... 20

*West Virginia v. EPA*,
   597 U.S. 697 (2022)................................................................................................ 23

*Williams v. Taylor*,
   529 U.S. 362 (2000)................................................................................................ 19

*Yates v. United States*,
    574 U.S. 528 (2015) ................................................................................................ 20

**STATUTES**

19 U.S.C. § 1303(a) ................................................................................................... 24

19 U.S.C. § 1516a(b) ................................................................................................... 9

19 U.S.C. § 1671 ................................................................................................... 11, 14

19 U.S.C. § 1671(a) ............................................................................................ *passim*

19 U.S.C. § 1677 ............................................................................................ 14, 23, 25

19 U.S.C. § 1677(3) .................................................................................................... 19

19 U.S.C. § 1677(5) ............................................................................................ *passim*

19 U.S.C. § 1677(5A) ......................................................................................... *passim*

19 U.S.C. § 1677(7) .................................................................................................... 19

19 U.S.C. § 1677(9) .................................................................................................... 18

19 U.S.C. § 1677j(b) ................................................................................................... 19

19 U.S.C. § 1677-1 ................................................................................................ 20, 22

19 U.S.C. § 1677b(c) .................................................................................................. 19

19 U.S.C. § 1677b(d) .................................................................................................. 19

19 U.S.C. § 3512(d) .................................................................................................... 25

**REGULATIONS**

19 C.F.R. § 351.527 ............................................................................................... 14, 15

**ADMINISTRATIVE MATERIALS**

*Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments*,
    54 Fed. Reg. 23,366 (Dep't Commerce May 31, 1989) ............................................ 22

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the
    Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766
    (Dep't Commerce Mar. 25, 2024) ....................................................................... 15, 16

*Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty
    Determination*,
    86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) ............................................ 22

LEGISLATIVE MATERIALS

H.R. 1548 (119th Cong.).................................................................................................. 26

S. 691 (119th Cong.) ..................................................................................................... 26

S. 1187 (117th Cong.) ................................................................................................... 26

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
   H.R. Doc. No. 103-316 (1994),
   *reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................................................... 25

Tariff Act of 1930, § 303, 46 Stat. 687 ....................................................................... 24

Trade Act of 1974, § 331(a),
   Pub. L. 93-618, 88 Stat. 2049 .................................................................................... 24

Uruguay Round Agreements Act,
   Pub. L. No. 103-465, § 251, 108 Stat. 4908 (1994).................................................. 24

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

CANADIAN SOLAR INTERNATIONAL LIMITED;
CANADIAN SOLAR MANUFACTURING
(THAILAND) CO., LTD.; CANADIAN SOLAR US
MODULE MANUFACTURING CORPORATION;
AMERICAN ALLIANCE FOR SOLAR
MANUFACTURING TRADE COMMITTEE; TRINA
SOLAR SCIENCE & TECHNOLOGY (THAILAND)
LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO.,
LTD.,

           Plaintiffs and Consolidated Plaintiffs,

    v.

UNITED STATES,

        Defendant,

   and

AMERICAN ALLIANCE FOR SOLAR
MANUFACTURING TRADE COMMITTEE,

        Defendant-Intervenor.

Consol. Ct. No. 25-161

**CANADIAN SOLAR PLAINTIFFS' RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiffs, consolidated plaintiff-intervenors, and consolidated defendant-intervenors, Canadian Solar International Limited ("CSIL"); Canadian Solar Manufacturing (Thailand) Co., Ltd. ("THSM"); and Canadian Solar US Module Manufacturing Corporation ("USMMC") (together, "Canadian Solar" or "Plaintiffs"), respectfully submit this Motion for Judgment on the Agency Record in accordance with Rule 56.2 of the Rules of the United States Court of International Trade ("CIT").  For the reasons set forth below, this Court should reverse the erroneous determination of the Department of Commerce ("Commerce" or "the Department") in

- 1 -

its countervailing duty ("CVD") investigation of crystalline silicon photovoltaic ("CSPV") cells, whether or not assembled into modules, from Thailand, and remand with instructions to issue a new determination consistent with this Court's decision. In the interest of efficiency and judicial economy, Canadian Solar confirms its agreement with and incorporation of all arguments advanced by mandatory respondent Trina Solar Science & Technology (Thailand) Ltd. ("TTL") stemming from TTL's complaint filed in Case No. 25-169 and its opening brief in this consolidated action. Canadian Solar writes separately to address Commerce's determination with respect to its authority to impose countervailing duties on alleged transnational subsidy programs relating to the provision of silicon wafers, silver paste, and solar glass from China.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is Commerce's final determination in its countervailing duty investigation of CSPV cells, whether or not assembled into modules, from Thailand. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2025) ("Final Determination"), and accompanying Issues and Decision Memorandum (Apr. 18, 2025), ACCESS 4750507-02 ("Final IDM") (P.R. 703).[1]

### II.    Statement of the Issues

1.    Whether Commerce's decision to investigate and impose countervailing duties on alleged "transnational" subsidies is lawful.

---

[1]    Throughout this brief, citations to the public record ("P.R.") refer to the administrative record of the CVD investigation.

2.      Whether Commerce's specificity finding for the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for less-than-adequate renumeration ("LTAR") is supported by substantial evidence and otherwise lawful.

3.      Whether Commerce's determination that TTL's affiliated suppliers are "Authorities" for purposes of the CVD analysis is supported by substantial evidence and otherwise lawful.

4.      Whether Commerce's tier two benchmark selection for valuing the cross-border provision of silicon wafers is supported by substantial evidence and otherwise lawful.

5.      Whether Commerce's benchmark selection for valuing the cross-border provision of solar glass is supported by substantial evidence and otherwise lawful.

6.      Whether Commerce's inconsistent treatment of functionally equivalent situations stemming from its failure to initiate an investigation on Malaysian producers' receipt of benefits from the cross-border provision of Chinese wafers for less-than-adequate renumeration is supported by substantial evidence and otherwise lawful.

7.      Whether Commerce's affirmative determination of critical circumstances as to all exporters and producers from Thailand is supported by substantial evidence and otherwise lawful.

## STATEMENT OF FACTS

Canadian Solar Inc. is a globally integrated solar company legally domiciled and incorporated in Canada; registered under the laws of the Province of Ontario, Canada; and maintaining its principal executive office and place of business in Guelph, Ontario, Canada. Its indirectly majority-owned subsidiaries Jeffersonville Cells Corporation and Mesquite Modules Corporation manufacture solar products in the United States. CSIL, also indirectly majority-owned by Canadian Solar Inc., is a Hong Kong-based trading company that sells and exports solar

products to markets around the world.  During the period investigated by Commerce, CSIL exported solar products manufactured by its affiliate, THSM, to the U.S. market.  THSM manufactured solar cells and modules at its facilities in Chonburi and Rayong, Thailand.

On May 14, 2024, Commerce initiated a CVD investigation of CSPV cells, whether or not assembled into modules, from Thailand.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 43,816 (Dep't Commerce May 20, 2024) (P.R. 103).  Following initiation, Commerce issued quantity and value ("Q&V") questionnaires to various entities, including Canadian Solar.  *See* Memorandum from Scot Fullerton to Ryan Majerus, *Decision Memorandum for the Preliminary Affirmative Determination and Preliminary Affirmative Critical Circumstances Determination, in Part, in the Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from Thailand* at 7 (Sept. 30, 2024), ACCESS 4640592-02 ("Prelim. IDM") (P.R. 509). Canadian Solar timely responded to the Q&V questionnaire.  On June 17, 2024, Commerce selected a single respondent for individual investigation, TTL.  *Id*. at 2.

On September 20, 2024, Canadian Solar provided comments for consideration in advance of the Preliminary Determination.  *Id*. at 3.

Commerce published its Preliminary Determination on October 4, 2024.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 80,874 (Dep't Commerce Oct. 4, 2024) (P.R. 523).  Commerce preliminarily calculated a *de minimis* subsidy rate for TTL and assigned a rate of 34.52 percent,

based on adverse inferences, to non-cooperative respondents Sunshine Electrical Energy and Taihua New Energy (Thailand) Co. Ltd. *Id*. at 80,875. Commerce preliminarily published an All Others rate of 23.06 percent, taking a simple average of TTL's and the non-cooperative respondents' rates, which was applicable to CSIL and THSM. *Id*. Commerce made an affirmative preliminary finding of critical circumstances for exporters and producers other than TTL. *Id*.

On January 7, 2025, Commerce issued a Post-Preliminary Analysis finding that the Government of China provides additional countervailable subsidies to TTL through the cross-border provision of materials for less-than-adequate remuneration (LTAR). Memorandum from Scott Fullerton to Steven Presing, *Decision Memorandum for the Post-Preliminary Analysis in the Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from Thailand* (Jan. 7, 2025), ACCESS 4694667-01 ("Post-Preliminary IDM") (P.R. 634); *see also* Memorandum from Henry Wolfe to Kathleen Marksberry, *Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from Thailand: Decision Memorandum on Additional New Subsidy Allegations* (Feb. 20 2025), ACCESS 4716272-01 ("NSA Memo") (P.R. 658). In its Preliminary Determination and subsequent post-preliminary memoranda, Commerce found that the cross-border provision of certain Chinese inputs used in the manufacture of solar products constituted countervailable subsidies. Prelim. IDM at 35-36 (P.R. 509) (provision of Chinese-origin polysilicon for LTAR); Post-Preliminary IDM at 9 (P.R. 634) (provision of Chinese-origin wafers, silver paste, and solar glass for LTAR); NSA Memo at 5 (P.R. 658) (recommending initiation with respect to the provision of Chinese-origin aluminum frames and junction boxes for LTAR).

On March 12 and March 20, 2025, parties (including Canadian Solar) timely submitted case and rebuttal briefs in advance of the Final Determination. Final IDM at 4 (P.R. 703). In its

March 12, 2025 case brief, the petitioner argued, among other things, that Commerce should use tier two benchmarks to measure any benefit provided by the cross-border provision of Chinese wafers. The petitioner requested that Commerce rely on monthly export data for wafers exported under Harmonized System ("HS") Code 3818.00 in UN Comtrade data for this tier two benchmark. *Id*. at 44. In its case and rebuttal briefs, Canadian Solar explained, *inter alia*, that Commerce should not find that the cross-border provision of solar inputs constitutes a countervailable subsidy and should not adopt the petitioner's silicon wafer benchmark requests. *See id.* at 41, 45, 51-53.

TTL also timely submitted case and rebuttal briefs in which it challenged Commerce's transnational subsidy determination. *Id*. at 24-25, 40-41, 70-71, 86-87.[2] TTL further argued that Commerce should employ a tier one benchmark to measure the benefit allegedly provided by the cross-border provision of Chinese wafers and solar glass. *Id*. at 44-47, 55-56. With respect to solar glass, TTL explained that the Preliminary Determination employed a tier one benchmark for valuing solar glass and that the petitioner's requested tier two benchmark of UN Comtrade data for HS Code 7007.19 was overly broad and not representative of actual purchases of solar glass. *Id*. TTL explained that Commerce should continue to employ a tier one benchmark in the Final Determination and, as an alternative, should rely on more reliable tier two benchmark data on the record than the UN Comtrade information. *Id*.

Commerce published the Final Determination on April 25, 2025. Commerce found a subsidy rate of 263.74 percent for TTL and 799.55 percent (based on adverse inferences) for Sunshine Electrical Energy and Taihua New Energy (Thailand) Co. Ltd. Final Determination,

---

[2]    In addition to challenging Commerce's legal authority and specificity determination, TTL challenged—(a) Commerce's finding that TCZ and TSM(SQ) were "Authorities" for purposes of the CVD analysis, and (b) Commerce's disparate treatment of its similarly-situated Thailand and Malaysia investigations with respect to the transnational subsidy issue. *Id*.

90 Fed. Reg. at 17,381.  Commerce applied TTL's 263.74 percent rate as the "All Others" rate for cooperative non-examined exporters and producers, including CSIL and THSM.  *Id*.

Commerce also found, *inter alia*, that it had the legal authority to investigate alleged transnational subsidies and "that the cross-border provision of Chinese-origin polysilicon, silicon wafers, silver paste, and solar glass for LTAR programs are *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act."  Final IDM at 26, 42 (P.R. 703).  Commerce justified its specificity finding by stating that "these inputs are provided to a limited number of industries, including the solar cells industry."  *Id*. at 43.  Commerce also found that Trina Solar Co., Ltd. ("TCZ") and Trina Solar (Suqian) Silicon Materials Co., Ltd. ("TSM(SQ)"), TTL's affiliated suppliers, were "Authorities" for purposes of the CVD analysis and that TTL's arguments concerning Malaysia had "no bearing" on this proceeding.  *Id*. at 72-75, 87.

Commerce additionally determined to use a tier two benchmark to measure the benefit provided by the cross-border provision of silicon wafers.  *Id*. at 43-55.  Commerce relied on UN Comtrade data for HS Code 3818.00 for its silicon wafer benchmark.  *Id*.  Commerce further determined to use a tier two benchmark to measure the benefit provided by the cross-border provision of solar glass.  *Id*. at 55-60.  Commerce relied on UN Comtrade data for HS Code 7007.19 for its solar glass benchmark.  *Id*.

Commerce published its CVD order on CSPV cells, whether or not assembled into modules, from Thailand on June 24, 2025.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders*, 90 Fed. Reg. 26,791 (Dep't Commerce June 24, 2025).  This consolidated action followed.

## SUMMARY OF THE ARGUMENT

This Court should hold Commerce's Final Determination unlawful and unsupported by the evidence. First, Commerce's determination to impose countervailing duties on "transnational" subsidies is not in accordance with law. Commerce has no statutory authority to countervail alleged subsidies provided by a government other than the country of export.

Second, Commerce's specificity finding for the cross-border provisions of Chinese silicon wafers, silver paste, and solar glass for LTAR is likewise unlawful. Commerce has no statutory authority to make specificity findings for transnational subsidy programs (underscoring its lack of authority to investigate such programs).

Third, Commerce's determination that TTL's affiliated suppliers are "Authorities" finds no support in the record and is thus unsupported by substantial evidence or otherwise unlawful.

Fourth, Commerce's tier two benchmark selection for valuing silicon wafers is unsupported by substantial evidence because Commerce erroneously relied on UN Comtrade data under a broad HTS Code and unreasonably declined to consider other sources on the record.

Fifth, Commerce's final benchmark selection for valuing solar glass is unsupported by substantial evidence because the agency selected an inaccurate, non-product specific benchmark and unreasonably ignored the tier one benchmark.

Sixth, Commerce's disparate treatment of similar situations stemming from its failure to initiate an investigation into whether producers in Malaysia benefited from the same cross-border provision of Chinse wafer for LTAR violates Commerce's obligation to treat similar situations consistently.

Finally, Commerce's affirmative determination of critical circumstances as to all exporters and producers from Thailand is unsupported by substantial evidence because the Department

unreasonably declined to consider contrary record evidence.  Consequently, this Court should reverse and remand Commerce's unlawful Final Determination.

## ARGUMENT

## I.   STANDARD OF REVIEW

This Court "shall hold unlawful any determination" found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."   19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citation omitted).  Substantial evidence must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established."  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).  In making its judgment, the Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citation and quotation marks omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding."  *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers*, *AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (citation and quotation marks omitted); *see also Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ("We determine the existence of substantial evidence by considering the record as a whole, including {detracting evidence}") (citation omitted).

Commerce's determinations must also be consistent with the governing statute.  Following the Supreme Court's decision in *Loper Bright Enterprises et al. v. Raimondo*, 603 U.S. 369 (2024), in which the Court overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), Commerce's interpretations of statutory provisions are not entitled to deference by this Court.

Instead, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.  In other words, this Court determines not whether an agency's "reading {is} 'permissible' in such a case," *id.* at 373 (referencing *Chevron*, 467 U.S. at 843), but rather whether the agency's interpretation reflects "the best reading of the statute. . . ." *Loper Bright*, 603 U.S. at 373.  In so doing, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . {and} need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413; *see also Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283, 1289 (Ct. Int'l Trade 2025) (citing *Loper Bright* in considering the lawfulness of a Commerce CVD determination).

Even before the Supreme Court's decision in *Loper Bright*, no deference was owed to Commerce when the intent of Congress was judicially ascertainable. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881-82 (Fed. Cir. 1998).  This requires the Court to "first carefully investigate the matter to {discern} Congress's purpose and intent on the question at issue." *Id.* at 881.  In determining the plain meaning of statutory language, the Court is required to employ the traditional tools of statutory construction (*e.g.*, dictionary definitions, grammatical structure). *See*, *e.g.*, *Pesquera Mares Australes v. United States*, 266 F.3d 1372, 1382-83 (Fed. Cir. 2001).  When appropriate, the Court will also consider legislative history to determine congressional intent. *Timex*, 157 F.3d at 882 (citing *Dunn v. Commodity Futures Trading Com'n*, 519 U.S. 465 (1997)).

## II.    CANADIAN SOLAR AGREES WITH AND INCORPORATES BY REFERENCE ALL ARGUMENTS RAISED BY MANDATORY THAI RESPONDENT TTL

Canadian Solar agrees with all arguments in TTL's complaint and opening brief, and in the interest of judicial efficiency and economy, joins and incorporates these arguments by reference. Specifically, Canadian Solar asserts the following:

- 10 -

(1)     Commerce's determination to countervail subsidies allegedly provided by the Government of China ("GOC") was not in accordance with law.  The governing statute, 19 U.S.C. § 1671, contains no explicit grant of authority for Commerce to impose countervailing duties on subsidies allegedly provided by governments of more than a single country or to entities outside the territory of the country that bestowed the alleged countervailable subsidy.  Thus, 19 U.S.C. § 1671 precludes Commerce from imposing countervailing duties on alleged "transnational" subsidies, except when it makes specific findings necessary to satisfy the specific requirements of 19 U.S.C. § 1671(d) or (e), which it did not do here.

(2)     Commerce's specificity finding for the cross-border provisions of Chinese wafers, silver paste, and solar glass for less-than-adequate remuneration is unlawful.  Commerce found these programs to be *de facto* specific as domestic subsidies under 19 U.S.C. § 1677(5A)(D).  Yet, the statute provides no legal basis for a specificity finding for transnational programs (underscoring Commerce's lack of authority to investigate such programs).  As defined in section 1677(5A)(D), domestic subsidies must be provided "to an enterprise or industry within the jurisdiction of the authority providing the subsidy."  The cross-border provision of solar inputs for less-than-adequate remuneration thus cannot be considered a domestic subsidy, rendering Commerce's determination improper.

(3)     Commerce's determination that TTL's affiliated suppliers are "Authorities" is not supported by substantial evidence.  Commerce ignored detracting evidence establishing that relevant shareholders are not party members or officials of the Chinese Communist Party ("CCP").  Nothing on the record supports a finding that

the suppliers are controlled or in any way involved with the CCP, and Commerce's determination is therefore unreasonable.

(4)     If Commerce's alleged authority to investigate transnational subsidies is sustained (which it should not be), Commerce's tier two benchmark selection for valuing silicon wafers is unsupported by substantial evidence.  In selecting global UN Comtrade data under a broad Harmonized Schedule code, HS 3818.00, Commerce erroneously determined that the Thai market for wafers was distorted, while unreasonably declining to consider other sources on the record specific to silicon wafers.[3]  Commerce's benchmark selection resulted in the application of a highly aberrational subsidy rate to TTL—this is evidenced by the nearly 2,000 percent increase in TTL's subsidy rate between the Preliminary Determination and the Final Determination.  Final IDM at 43-54 (P.R. 703).  This issue should thus be remanded.

(5)     Commerce's benchmark selection for valuing solar glass is likewise unsupported. The record contains viable tier one benchmarks for valuing solar glass, including TTL's actual purchases, which Commerce relied on in the Preliminary Determination.  Commerce's decision to ignore tier one benchmarks and instead select a more inaccurate, non-product specific benchmark in its Final Determination was unreasonable and contrary to the record.  Final IDM at 55-60 (P.R. 703).

(6)     Commerce's disparate treatment of similar situation stemming from its failure to initiate an investigation on whether producers in Malaysia benefited from the same

---

[3]     Consistent with the arguments explained in Section III, *infra*, the concept of a "distortion" based on subsidies from a *third-country* authority (the Government of *China*) is not supported by the statute.  Commerce's finding of a distortion based on alleged subsidies in China—in a Thailand investigation—is not supported by substantial evidence or otherwise in accordance with law.  *See* Final IDM at 47-54 (P.R. 703).

cross-border provision of Chinese wafer for less-than-adequate remuneration was unlawful. Record evidence was submitted in this proceeding to establish that producers in Malaysia—the only country for which the cross-border provision of Chinese solar inputs for less-then-adequate remuneration was not investigated—used the same sourcing patterns alleged against producers in this and other proceedings. Commerce's disregard for the identical behavior and practices occurring with producers in Malaysia shows that Commerce's determination in this case was unreasonable. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (it is "well-established that an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently").

(7)     Commerce's affirmative determination of critical circumstances as to all exporters and producers from Thailand was unsupported by substantial evidence. The record shows that the increase in shipments following the filing of the petition was entirely attributable to exports of solar cells to fuel U.S. module manufacturing, and Commerce unreasonably declined to consider that evidence. Commerce's affirmative critical circumstances finding is therefore unlawful.[4]

In parallel, Canadian Solar writes separately to address in further detail Commerce's determination to countervail alleged transnational subsidy programs.

---

[4]     Canadian Solar understands that this issue currently is not ripe for review because the International Trade Commission's threat finding in its companion investigation—currently subject to challenge before this Court in Ct. No. 25-163, *American Alliance for Solar Manufacturing Trade Committee v. United States*—means that Commerce has not effectuated its critical circumstances finding. Nonetheless, Canadian Solar seeks to preserve its right to pursue this issue in the event it becomes ripe at a later point in the litigation.

**III.    COMMERCE'S DETERMINATION TO APPLY COUNTERVAILING DUTIES TO ALLEGED TRANSNATIONAL SUBSIDY PROGRAMS IS UNLAWFUL**

Commerce is prohibited by statute from assessing CVD duties on alleged "transnational subsidies" provided by third countries.  The plain text of 19 U.S.C. §§ 1671 and 1677 limits CVD investigations by law to investigations of subsidies bestowed by a single country.  Commerce's mere withdrawal of its regulation explicitly prohibiting transnational subsidy investigations under 19 C.F.R. § 351.527 cannot override the statute's unambiguous mandate.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374-75 (1986) ("To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress.").  Here, Commerce exceeded its authority by seeking to countervail several alleged transnational subsidy programs—namely, China's allegedly subsidized provision of (1) silicon wafers, (2) silver paste, and (3) solar glass for less-than-adequate remuneration.  *See* Final IDM at 3, 12-14 (P.R. 703).[5]  This Court should remand Commerce's determination with instructions to recalculate the CVD rate for Canadian Solar without regard to any transnational subsidies.

**A.    The Statute's Plain Language Prohibits Transnational Subsidy Investigations**

Both the plain text and the statutory context of 19 U.S.C. § 1671(a) demonstrate that Commerce lacks authority to impose CVD deposits stemming from subsidies allegedly provided by more than one government in a single investigation.  It is well-established that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' "  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) (internal citation

---

[5]    Commerce also initiated investigations of other alleged transnational subsidies that it ultimately deferred or did not apply to TTL.  *See* Final IDM at 3, 12 (P.R. 703).  Canadian Solar understands that if the Court rules in its favor with respect to the illegality of transnational subsidy investigations, Commerce would also be precluded from later countervailing these other programs.

omitted); *see also Loper Bright*, 603 U.S. at 400 ("It therefore makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best . . . if it is not the best, it is not permissible."). Here, Section 1671(a) provides that Commerce shall impose CVD deposits only if the agency:

> determines that the government of *a country* or any public entity within the territory of *a country* is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States

19 U.S.C. § 1671(a) (emphases added). Likewise, the statute's definition of a "Countervailable Subsidy" states that it is granted by an "authority" constituting "a government of *a country* or any public entity within the territory of *the country*." 19 U.S.C. § 1677(5)(B) (emphasis added). The statute's repeated use of the singular "a country" and "the country" makes clear that Commerce's CVD proceedings are limited to subsidies bestowed by a single country.

Indeed, prior to its revocation in 2024, Commerce's regulation on transnational subsidies stated that "a subsidy does *not exist* if the Secretary determines that the funding for the subsidy is supplied in accordance with, and as part of, a program or project funded: (a) By *a government* of *a country* other than *the country* in which the recipient firm is located . . . ." 19 C.F.R. § 351.527 (2023) (emphases added). Commerce revoked this regulation in its entirety, without providing replacement language. *See* Final IDM at 26-28 (P.R. 703); *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,827 (Dep't Commerce Mar. 25, 2024) ("*Final Transnational Subsidy Rule*"). Commerce relied on its withdrawal of this prohibition as its legal support for countervailing alleged transnational subsidies in this investigation. *See* Final IDM at 26-28 (P.R. 703).

Commerce, however, provided no statutory analysis to support its new interpretation of its obligations under 19 U.S.C. § 1671(a).  *See Final Transnational Subsidy Rule*, 89 Fed. Reg. at 20,826-28.  Instead, Commerce merely claims that its new interpretation is based on its practical experience from past investigations and the changing nature of global trade.  *See id*.  Commerce's practical experience cannot upend the plain text of the statute limiting its investigation to a single country.  Commerce's reliance on the change to its regulation as its legal support for countervailing alleged transnational subsidies thus was not in accordance with law—Commerce has failed to support how its amended regulation did not conflict with the plain text of 19 U.S.C. § 1671(a).  *Cf. GPX International Tire Corp. v. United States*, 666  F.3d  732 (Fed. Cir. 2011)  (rejecting Commerce's similar reversal regarding CVD law's application to non-market economies).

Commerce also claims that the phrase "a country" in 19 U.S.C. § 1671(a) could refer to multiple countries, including countries without merchandise subject to investigation.  *See* Final IDM at 26-29 (P.R. 703).  The crux of Commerce's reasoning is its assertion that the statute's "use of the indefinite article in '*a* country' indicates that the country of the authority providing a countervailable subsidy may be distinct and separate from the country where the countervailable subsidy is received."  *Id*. at 26.  Even considered in a vacuum, the statute's plain text does not suggest that Congress intended "a country" to include multiple countries.  *See Arista Networks, Inc. v. Cisco Sys.*, 908 F.3d 792, 803 (Fed. Cir. 2018) ("Where 'the statutory language is plain, we must enforce it according to its terms.' ") (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

Contrary to Commerce's suggestion that the indefinite article "a" opens the door to investigation of multiple countries, using the definite article "the" in its place would either indicate an internal reference to one specific country, or else be grammatically incorrect.  The presence of an indefinite article simply means that the identity of the subsidizing country is not specified.  *See*

- 16 -

"A," Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/a (last visited June 1, 2026) ("used as a function word before singular nouns when the referent is unspecified"). It does not connote multiples, as Commerce suggests.  Moreover, as we discuss below, the statute *does use* the definite article "*the* country" in 19 U.S.C. § 1677(5)(B) (emphasis added)—the statute's foundational definition of a "Countervailable Subsidy."

Commerce's interpretation equally fails to give meaning to the phrase "any public entity *within the territory of a country*" because such an interpretation would permit Commerce, in a single investigation, to impose CVD deposits on alleged countervailable subsidies bestowed both by a public entity *within the territory* of Thailand *and* by a public entity in China *outside the territory* of Thailand.  The text of 19 U.S.C. § 1671(a) clearly does not expand the scope of countervailable subsidies beyond the territory of a country in which merchandise is manufactured, produced, or exported except in the limited circumstances provided elsewhere in the statute (discussed below).[6]

### B.    The Statute's Basic Definitions of Countervailing Duties Are All Oriented Toward A Specific Country

The CVD statute's foundational definitions at 19 U.S.C. § 1677 lend even further weight contrary to Commerce's position because Congress clearly structured them to orient Commerce toward examining an alleged subsidy in a single country—not the transnational provision of a subsidy by one country in the territory of another country.  All of the statute's basic CVD definitions are crafted to target the conferral of subsidies by the single, specific country subject to

---

[6]    Commerce states that Section 1671(a) "does not specify that the 'government of a country or any public entity within the territory of a country' providing a countervailable subsidy must be the same government or public entity as the government of the country within which that subsidy is received."  *Id*.  This conflicts with the statute's core definition of a "Countervailable Subsidy"— which specifies that such a subsidy is granted by "*a government* of *a country* or any public entity within the territory of *the country*."  19 U.S.C. § 1677(5)(B) (emphases added).

the investigation.  Indeed, as set forth below, several of these foundational definitions refer specifically to "*the* country," "*the* authority," or "*the* government" of the exporting country subject to the investigation:

- **Countervailable Subsidy**: "A subsidy is described in this paragraph in the case in which *an authority*—(i) provides a financial contribution, (ii) provides any form of income or price support . . . , or (iii) . . . entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in *the government* . . . {T}he term 'authority' means *a government of a country* or any public entity within *the territory of the country*."  19 U.S.C. § 1677(5)(B).

- **Benefit Conferred**: "A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—(i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors . . . *in the country in which the equity infusion is made*, . . . (iii) in the case of a loan guarantee, if there is a difference . . . between the amount the recipient of the guarantee pays . . . and the amount the recipient would pay for a comparable commercial loan if there were no guarantee *by the authority*, and (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

  For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased *in the country which is subject to the investigation or review*."  19 U.S.C. § 1677(5)(E).

- **Specificity (Domestic Subsidy)**: "In determining whether a subsidy . . . is a specific subsidy, in law or in fact, to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*, the following guidelines shall apply: . . ."  19 U.S.C. § 1677(5A)(D).

- **Interested Party**: "The term 'interested party' means— . . . (B) *the government* of *a country in which such merchandise is produced or manufactured or from which such merchandise is exported*, . . . ."  19 U.S.C. § 1677(9).

Through these precise definitions, Congress clearly limited the types of subsidy allegations that could be found countervailable to those in the country under investigation.

C.      **Multiple Other Aspects of the Statute Contradict Commerce's Interpretation**

Moreover, multiple aspects of statutory context and structure refute Commerce's interpretation.  To begin, it is apparent from other provisions of the AD/CVD statutes that Congress

is well aware of how enact a trade remedy law that focuses on more than one country when it so intends.  For example, Congress stated clearly in 19 U.S.C. § 1677b(c) that Commerce will value factors of production in non-market economy antidumping cases based on information from "a market economy *country or countries*" and also discussed merchandise that is "produced in *one or more market economy countries* . . ."  19 U.S.C. §§ 1677b(c)(1)(B), (2)(B) (emphases added); *see also id.* at § 1677b(c)(4) (similarly referencing factors of production from "one or more market economy countries"*)*.    Likewise, Congress enacted a special rule for certain multinational corporations "located in another country or countries."  *Id*. at § 1677b(d).

Congress also uses the plural term "countries" liberally in the AD/CVD statutes.  *See*, *e.g.*, 19 U.S.C. § 1677(3) (defining "country" to include "an association of 2 or more foreign countries" in a customs union); 19 U.S.C. § 1677(7)(F)(iii) (ITC considers "dumping in the markets of foreign countries . . ."); 19 U.S.C. § 1677j(b) (discussing "merchandise completed or assembled in other foreign countries").  If Congress had intended for a single CVD investigation to cover alleged subsidies granted by multiple countries, it would have similarly used one of these plural forms of the term "countries" in the statute.  The fact that Congress, instead, referred to a single country in Section 1671(a) and 1677(5)(B) clearly indicates that CVD investigations are not intended to extend to alleged subsidies by multiple countries.

Similarly, Commerce's interpretation that Section 1671(a) freely permits it to investigate alleged transnational subsidies conflicts with other provisions of 19 U.S.C. § 1671 that set forth specific circumstances in which Commerce can look to subsidies stemming from third-party countries.  Commerce's interpretation essentially renders those adjacent provisions superfluous.  It is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute."  *Williams v. Taylor*, 529 U.S. 362, 404 (2000).  Relevant here, 19

- 19 -

U.S.C. § 1671(d) provides that Commerce can countervail subsides provided by multiple countries if they are part of an international consortium.  The statute at Sections 1671(e) and 1677-1(a) likewise authorizes Commerce to apply CVD duties when upstream subsidies are cumulated by "an association of 2 or more foreign countries . . . organized into a customs union."  19 U.S.C. § 1677-1(a).  In other words, Congress carefully confined Commerce's authority to address multi-country subsidies to narrow circumstances in which those countries are part of a consortium or a customs union providing upstream subsidies.  This structure, with the adjacent, specifically-designed provisions in Section 1671, would be pointless if Commerce already had plenary authority under Section 1671(a) to countervail a subsidy provided by one country to a producer located in another country, irrespective of whether the two countries were part of a consortium or customs union.

Courts have repeatedly recognized that statutory context and structure are important factors in statutory interpretation.  *E.g.*, *Yates v. United States*, 574 U.S. 528, 537 (2015); *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014).  The statutory context in this case establishes that Commerce's strained interpretation of Section 1671(a) cannot stand because Congress addressed the specific circumstances in which Commerce can investigate transnational subsidies in other provisions and oriented the statute more generally to subsidies in a single country.  Indeed, "for a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity."  *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1357 (Ct. Int'l Trade 2024) (citing *Loper Bright*, 603 U.S. at 395).  Here, Commerce wrongfully asserts that the absence of a provision preventing it from investigating alleged transnational subsidies provides affirmative authority allowing it to investigate such subsidies.  *See* Final IDM

at 26 (P.R. 703) (relying on statute's use of an indefinite article to claim that "the authority providing a countervailable subsidy *may* be distinct and separate from the country where the countervailable subsidy is received") (emphasis added). This is wrong. There is no such authority, and the statute cannot be interpreted to include multiple countries when that interpretation conflicts with multiple other parts of the statute.

For similar reasons, Commerce's newly minted position that it is generally permitted to countervail transnational subsidies violates the well-established statutory interpretation canon of *expression unius est exclusio alterius*. *See*, *e.g.*, *Esteras v. United States*, 606 U.S. 185, 195 (2025) ("in plain English, 'expressing one item of {an} associated group or series excludes another left unmentioned' ") (citation omitted). The canon applies in this case because the statute repeatedly references Commerce's authority to impose CVD duties on benefits provided by the government of a *single country*, while also enumerating the specific instances in which it authorizes Commerce to impose CVD deposits on benefits allegedly provided by third-party countries. In doing so, it precludes Commerce's interpretation that the statute *also* implicitly authorizes Commerce to impose CVD deposits on subsidies allegedly originating in third-party countries *outside* of the circumstances that the statute enumerates. *See Ventas, Inc. v. United States*, 381 F.3d 1156, 1161 (Fed. Cir. 2004) ("Where Congress includes certain exceptions in a statute, the maxim *expressio unius est exclusio alterius* presumes that those are the only exceptions Congress intended.").

Conversely, Commerce's dubious conclusion that interpreting Section 1671(a) to include general authority to investigate transnational subsidies would not render the portions of the statute pertaining to international consortia and upstream subsidies superfluous glaringly conflicts with Commerce's own prior statements and interpretation of the statute. *See* Final IDM at 30 (P.R. 703). In initially promulgating its regulation prohibiting transnational subsidies, Commerce found

- 21 -

that transnational subsidies are not countervailable "to the extent that funds for the program are not provided by *the government of the country in question*." *Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments*, 54 Fed. Reg. 23,366, 23,374 (Dep't Commerce May 31, 1989) (emphasis added).

Strikingly, as recently as its 2021 determination in *Utility Scale Wind Towers from Maylasia*, Commerce explained that "to allow Commerce to inherently address subsidies from governments outside the country under investigation without evidence of the responding companies participation in an international consortium engaged in the production of subject merchandise – *would render the international consortium provision superfluous*." *Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) and accompanying IDM Cmt. 6 (emphasis added) (Section 1671(a)'s "language indicates that the general rule is that Commerce's CVD analysis is focused on a particular (*i.e.*, 'the') government of a country."). Commerce further explained that the fact that the statute "identifies a narrow set of circumstances under which benefits from an authority operating outside of the country in question, or in the form of a supranational entity, may be countervailed, *suggests that the general rule is that countervailable subsidies are limited to those provided by the country under investigation*." *Id*. (emphasis added) (citing 19 U.S.C. § 1677-1).

Commerce provides no explanation (nor could it) for its 180-degree reversal in statutory interpretation. *See* Final IDM at 30 (P.R. 703). Moreover, its attempted justification that the transnational subsidy allegations here are "not the circumstances applicable to sections {1671 (d)} or {1671 (e)}" entirely misses the point. *Id*.; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency acts arbitrarily when it "entirely fail{s} to consider an important aspect of the problem"). If Commerce had plenary authority to investigate

- 22 -

transnational subsidies—as it now claims in this case—then there would be no need for Congress to have specified in 19 U.S.C. §§ 1671(d) and (e) that Commerce can investigate such subsidies in those specific circumstances.  Commerce's empty justification thus underscores why its interpretation should be rejected.

Finally, this Court's analysis should be informed by the "major questions" doctrine, which requires that Congress's intent be clear to support such a significant expansion of agency regulatory authority.  It is well established that when an agency "claim{s} to discover in a long-extant statute an unheralded power" that would result in a "transformative expansion in {its} regulatory authority," the major questions doctrine requires the agency identify "clear congressional authorization" of that authority, rather than "a merely plausible textual basis."  *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022).  Moreover, the doctrine is especially apt when (as in this case) the longstanding interpretation of the statute was that it did not entail such a power.  *See Learning Resources, Inc. v. Trump*, 607 U.S. __,146 S. Ct. 628, 641 (2026) (Roberts, J., plurality) ("lack of historical precedent" was a "telling indication" contrary to Government's statutory interpretation).  Applying the doctrine here, this Court should reject Commerce's interpretation that it is now allowed to countervail transnational subsidies under Section 1671(a); a power of such significance requires clear congressional approval.

In sum, the plain language of 19 U.S.C. § 1671 and the definitions set forth at 19 U.S.C. § 1677 prohibit Commerce from pursuing CVD remedies against alleged transnational subsidies. Commerce's determination to the contrary is unlawful.

**D.    The Legislative History of the Definition of "Subsidy" Further Demonstrates that Congress Did Not Intend for Transnational Subsidies To Be Countervailable**

Section 1671's plain language and the definitions set forth at 19 U.S.C. § 1677 are sufficient to establish that the CVD statute does not authorize Commerce's transnational subsidy

- 23 -

findings in this case.  *See Arista Networks*, 908 F.3d at 803.  If there were any doubt, however, the authoritative legislative history underlying the statute's definition of "subsidy" and Congress's recent attempt to amend the statute to remove the prohibition against countervailing transnational subsidies further demonstrate that Congress intended subsidy investigations to be restricted to a single country.

The Tariff Act originally provided that a duty shall be imposed "{w}henever *any country* . . . shall pay or bestow . . . any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or *produced in such country* . . . ."  Tariff Act of 1930, § 303, 46 Stat. 687 (emphases added).  The Tariff Act therefore inherently linked the country providing the bounty or grant to the country manufacturing or producing the subsidized merchandise.  Congress substantially retained this definition in the amendments it made as part of the Trade Act of 1974, § 331(a), Pub. L. 93-618, 88 Stat. 2049, and it was subsequently codified at 19 U.S.C. § 1303(a)(1).  *See Ceramica Regiomontana, S.A. v. United States*, 64 F.3d 1579, 1580 (Fed. Cir. 1995) (discussing evolution of CVD law).

The passage of the Uruguay Round Agreements Act ("URAA") resulted in codification of the definition of "subsidy" to align with the WTO Agreement on Subsidies and Countervailing Measures, *see* URAA, Pub. L. No. 103-465, § 251, 108 Stat. 4908 (1994), which was ultimately codified at 19 U.S.C. § 1677(5).  Addressing the meaning of "subsidy," the authoritative Statement of Administrative Action states that "{i}n general, the Administration intends that the definition of 'subsidy' will have *the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute*, unless that practice or interpretation is inconsistent with the definition contained in the bill."  Statement of Administrative Action accompanying the URAA, H.R. Doc. No. 103-316 at 925 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040 (emphasis added) ("SAA").[7]  Therefore, the definition of "subsidy" as that term is used in 19 U.S.C. §§ 1671 and 1677 retains its original meaning—namely, that the singular language "the government" of "a country" in the statute refers to a singular country and does not authorize Commerce to countervail subsidies allegedly provided by third countries.

Moreover, Congress's recent attempts to amend the statute to authorize transnational subsidy investigations reinforce that Commerce is currently prohibited from investigating transnational subsidies.  In 2021, for example, Congress introduced legislation entitled the Eliminating Global Market Distortions to Protect American Jobs Act, which proposed the following changes to the definition of "Countervailable Subsidy" and "Interested Party" in 19 U.S.C. § 1677:

> SEC. 201.  ADDRESSING CROSS-BORDER SUBSIDIES IN COUNTERVAILING DUTY INVESTIGATIONS.
>
> (a) Definitions.—
> (1) Countervailable Subsidy.—Section 771 of the Tariff Act of 1930 (19 U.S.C. 1677) is amended—
> (A) in paragraph (5)(B)—
> . . .
>
> **(ii) in the flush text after clause (iii), by striking "the country" and inserting "a country"**; and
>
> (B) in paragraph (9)—
> (i) in subparagraph (B), by inserting after "is exported" the following: "or the authority (as defined in paragraph (5)(B)) alleged to have provided subsidies to a producer of an input of such merchandise";
> . . .
>
> (iv) by adding at the end {of paragraph (9)} the following:

---

[7]    The SAA is the "authoritative expression by the United States concerning the interpretation and application of the {URAA} in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

> **"(H) in any investigation or administrative review under this title involving an allegation that a subsidy is provided by an authority (as defined in paragraph (5)(B)) within the territory of a country other than the country in which the subject merchandise is produced, a foreign manufacturer, producer, or exporter of an input used in the production of the merchandise."**

S. 1187, 117th Cong. § 201, *Addressing Cross-Border Subsidies In Countervailing Duty Investigations* (2021) (emphasis added). This statutory change was never enacted; however, if Commerce were free to investigate transnational subsidies subject to its own discretion, there would not be any need for such specific legislative amendments to allow for exactly this course of action—in particular to change the contrary definition of "Countervailable Subsidy" referring to a single country. The existence of this specific amendment aimed at permitting transnational subsidy investigations underscores that they are currently prohibited by the statute.[8]

Commerce in its determination disagreed that the existence of these legislative proposals evidences that transnational subsidy investigations are prohibited, claiming that "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." Final IDM at 29-30 (P.R. 703) (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)). Here, however, the proposed legislation merely underscores what is already apparent from the statutory text, context, and authoritative history. The statute's repeated use of singular terms, enumeration of specific circumstances in which Commerce can pursue transnational subsidy allegations, and general structure to address subsidies in a single country all preclude Commerce's attempt to investigate alleged transnational subsidies here.

---

[8]    Indeed, there have been even more recent efforts in Congress to amend the statute to allow Commerce to countervail cross-border subsidies. For example, the Leveling the Playing Field 2.0 Act, introduced in 2025, includes a section titled "Addressing cross-border subsidies in countervailing duty investigations" (Section 201). H.R. 1548 (119th Cong.); S. 691 (119th Cong.).

**E.** **Commerce's Findings that the Alleged Transnational Subsidies Were Specific Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

In addition to the statutory and regulatory issues addressed above, Commerce lacks the authority under 19 U.S.C. § 1677 to impose CVD duties on transnational subsidies allegedly involving the purchase of inputs for less-than-adequate remuneration because such subsidies inherently lack specificity.

To be countervailable, a subsidy must be "specific" as defined by 19 U.S.C. § 1677(5A). *See Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020). "To be 'specific' a subsidy must be 'an export subsidy,' 'an import substitution subsidy,' or one of certain "domestic subsid{ies}." *Id*. (quoting 19 U.S.C. § 1677(5A)).  In particular, with respect to domestic subsidies, the statute provides:

> In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an *enterprise or industry within the jurisdiction of the authority providing the subsidy*, the following guidelines shall apply.  {Listing factors} . . . In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities *within the jurisdiction of the authority providing the subsidy*, and the length of time during which the subsidy program has been in operation.

19 U.S.C. § 1677(5A)(D) (emphases added).  The statute further defines "authority" as "a government of *a country* or any public entity *within the territory of the country*." *Id*. § 1677(5)(B) (emphases added).

Commerce unlawfully found that the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for LTAR programs were all *de facto* specific.  *See* Final IDM at 42‑43 (P.R. 703) (relying on *de facto* specificity under 19 U.S.C. § 1677(5A)(D)(iii)(I)).  In particular, relying on facts otherwise available, Commerce determined that "these inputs are provided to a limited number of industries, including the solar cells industry."  Final IDM at 43 (P.R. 703).

Commerce further found that TTL was "within the jurisdiction of the granting authority," and identified the "authority" as the GOC. *Id.* Commerce did not find that the GOC provided inputs directly for less-than-adequate remuneration, but that "state-invested enterprises" controlled by the GOC provided these inputs. *Id.* Citing the GOC's State-Owned Assets Law, Commerce reasoned that a " 'state-invested enterprise' is defined as a 'wholly state-owned enterprise or company with the state being the sole investor, or a company in which the state has a stake, whether controlling or non-controlling,' " and therefore that a state-invested enterprise would be subject to GOC jurisdiction, even if it were located in a separate country. *Id.* Concerning the specific producers of silicon wafers, silver paste, and solar glass alleged to be providing inputs at LTAR, Commerce found that these entities were "authorities" based on facts otherwise available. *Id.* at 36.

Plainly, the statute required Commerce to limit its analysis of specificity to "*within the jurisdiction of the authority* providing the subsidy." 19 U.S.C. § 1677(5A)(D) (emphasis added). Further, the statute defines an "authority" as "a government of <u>*a country or any public entity within the territory of <u>the</u> country*</u>." *Id.* § 1677(5)(B) (emphasized added). Commerce exceeded its authority by ignoring that the statute provided a limited definition of authority that does not cover public entities located *outside* of the subject country.[9] In this case, TTL is clearly located outside the jurisdiction of the GOC, the government alleged to be providing subsidies.

The statute does not contemplate any basis for specificity regarding the provision of materials from the jurisdiction of one authority to the jurisdiction of a separate authority. Indeed,

---

[9]     Similarly, as we established above, the statute specifically provides that in determining whether a "benefit" is conferred "in the case where goods or services are provided . . . the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased *in <u>the country</u> which is subject to the investigation or review*." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added). Thus, the statute's plain language makes clear that it is the conditions in Thailand—not China—that are relevant to the various elements of the subsidy determination. *See Arista Networks*, 908 F.3d at 803.

a claimed distortion, by definition, cannot exist "within the jurisdiction of the authority providing the subsidy" if it concerns matters that allegedly apply across multiple countries. 19 U.S.C. § 1677(5A)(D). Commerce's finding that the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for LTAR programs were all *de facto* specific thus was unsupported by substantial evidence and otherwise unlawful because Commerce's findings conflict with the plain statutory language limiting a specific domestic subsidy to the country under investigation.

Commerce's decision to countervail transnational subsidies allegedly provided to TTL was unsupported by substantial evidence and otherwise not in accordance with law because Commerce is prohibited by statute from assessing CVD duties on subsidies provided by third countries. Canadian Solar respectfully requests that this Court remand Commerce's transnational subsidy determinations with instructions to remove any subsidies calculated for these programs consistent with Commerce's statutory obligations.

## CONCLUSION

For these reasons, Canadian Solar respectfully requests that this Court grant this Motion for Judgment on the Agency Record and remand the Final Determination to Commerce with instructions for redetermination consistent with the Court's opinion.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Joshua E. Kurland
Michael G. Jacobson
Nicholas R. Sparks
Lindsay K. Brown

**HOGAN LOVELLS US LLP**
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd., and Canadian Solar US Module Manufacturing Corporation*

Dated: June 10, 2026

- 30 -

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jonathan T. Stoel, hereby certify that this brief complies with the word limitations set forth in the Court's May 11, 2026, Amended Scheduling Order. ECF No. 30. Excluding the table of contents, table of authorities, and signature block, the word count for this brief is 8,656 words. This brief thus complies with the Court's Order, which permits up to 14,000 for the Opening Brief.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel

Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109

*Counsel to Canadian Solar International Limited, Canadian Solar Manufacturing (Thailand) Co., Ltd., and Canadian Solar US Module Manufacturing Corporation*

Dated: June 10, 2026